## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

LAW OFFICE OF BRETT M
BORLAND, P.C. AND BRETT
BORLAND, INDIVIDUALLY

          Plaintiffs,

vs.

SULAIMAN LAW GROUP, LTD.
a/k/a ATLAS CONSUMER LAW;
NATHAN C. VOLHEIM; AND
YADIRY PENA JIMINEZ a/k/a
YADIRY BENAVIDES,
INDIVIDUALLY

         Defendants.

CIVIL ACTION
FILE NO.

## **COMPLAINT FOR DECLARATORY RELIEF**

COMES NOW, Plaintiffs, LAW OFFICE OF BRETT M BORLAND, P.C.

AND BRETT BORLAND, individually (hereinafter "Plaintiffs") and files this

Complaint for Declaratory Judgment against Defendants, SULAIMAN LAW

GROUP, LTD. a/k/a ATLAS CONSUMER LAW; NATHAN C. VOLHEIM;

AND YADIRY PENA JIMINEZ a/k/a YADIRY BENAVIDES, individually, and

shows the Court as follows:

## NATURE OF ACTION

### 1.

This is an action for Declaratory Judgment brought pursuant to Rule 57 of the Federal Rules of Civil Procedure and 28 U.S.C. § 2201 et. Seq., for the purpose of determining questions of actual controversy that presently exists between the parties.

## JURISDICTION AND VENUE

### 2.

This Court has original jurisdiction pursuant to 28 U.S.C. § 1331, because this action involves a federal question under the Fair Debt Collection Practices Act, codified at 15 U.S.C. § 1692 et. Seq.

### 3.

Venue is proper pursuant to 28 U.S.C. § 1391.

## PARTIES

### 4.

Plaintiff, Law Office of Brett M Borland, P.C. ("BORLAND FIRM"), is a Georgia Professional Corporation with its principal place of business within this district, being located in Cobb County, Georgia.

5.

Plaintiff, Brett Borland (hereinafter "BORLAND"), is the Chief Executive Officer of BORLAND FIRM and resides within this district.

6.

Defendant, SULAIMAN LAW GROUP, LTD. a/k/a ATLAS CONSUMER LAW, (hereinafter "SULAIMAN LAW") is upon information and belief, a foreign corporation, incorporated under the laws of Illinois with its principal place of business located at 2500 South Highland Ave, Suite 200 Lombard, IL 60148. SULAIMAN LAW has purposefully availed itself of the jurisdiction of this Court as further stated herein.  SULAIMAN LAW may be served with Summons and Complaint at 2500 South Highland Ave, Suite 200 Lombard, IL 60148.

7.

Co-Defendant, NATHAN C. VOLHEIM (hereinafter "VOLHEIM"), is upon information and belief a resident of Illinois.  VOLHEIM has purposefully availed himself of the jurisdiction of this Court as further stated herein. VOLHEIM may be served with Summons and Complaint at 2500 South Highland Ave, Suite 200 Lombard, IL 60148.

8.

Co-Defendant, YADIRY PENA JIMINEZ a/k/a YADIRY BENAVIDES (hereinafter "YADIRY"), is upon information and belief a resident of Georgia. YADIRY has purposefully availed herself of the jurisdiction of this Court as further stated herein. YADIRY may be served with Summons and Complaint at 1332 MARCELLE HEIGHTS PL NORCROSS GA 30093-3944.

## STATEMENT OF FACTS

9.

On or about September 26, 2018, Defendants SULAIMAN LAW and VOLHEIM, drafted, prepared, faxed, emailed and mailed and/or caused to be drafted, prepared, faxed, emailed and mailed, correspondence on the letterhead of Defendant, SULAIMAN LAW.  A true and correct copy of the September 26, 2018 correspondence is attached hereto as Exhibit "A."

10.

The September 26, 2018 correspondence states that SULAIMAN LAW. represents Co-Defendant, YADIRY and purports to be drafted on behalf of Co-Defendant, YADIRY.   Said correspondence is signed by Co-Defendant,

VOLHEIM.  A true and correct copy of the September 26, 2018 correspondence is attached as Exhibit "A."

11.

The September 26, 2018 correspondence threatens to name Plaintiff(s) and/or makes allegations against Plaintiff(s) intending to cause Plaintiff(s) harm either directly or indirectly for alleged violations of the Fair Debt Collections Practices Act.

12.

The September 26, 2018 correspondence states in relevant part:

> "On or around September 6, 2018, your firm caused to be sent a correspondence seeking payment of the subject consumer debt.  Because your firm is collecting on a consumer obligation allegedly owed to CCA it is subject to the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 et seq. In your correspondence sent to our Client, you identify yourself as a debt collector that is attempting to collect a debt."

13.

Attached hereto as Exhibit "B" is a true and correct copy of the September 6, 2018 letter referenced in the Defendants September 26, 2018 letter.

14.

The September 26, 2018 correspondence (Exhibit "A") states further in relevant part:

> "The correspondence violates numerous provisions of the FDCPA. Most notably, it purports to be reviewed by two attorneys in the signature line, yet bears only one signature. Our Client alleges this is false and misleading conduct. Moreover, the correspondence seeks collection of an obligation not owed by our Client.""  A true and correct copy of the September 26, 2018 correspondence is attached as Exhibit "A."

15.

The September 26, 2018 correspondence (Exhibit "A") threatens litigation against Plaintiffs if Plaintiffs fail to respond by October 18, 2018. See Exhibit "A".

16.

On January 10, 2019, Defendants, drafted, prepared and emailed and/or caused to be drafted, prepared and emailed correspondence to Plaintiff(s) further availing themselves to the jurisdiction of this court. A true and correct copy of the January 10, 2019 email correspondence is attached as Exhibit "C"

17.

On January 10, 2019, Plaintiffs responded to Defendant(s) January 10, 2019 email and provided documents validating Co-Defendant, YADIRY, alleged debt. A true and correct copy of the January 10, 2019 email correspondence is attached as Exhibit "D".

18.

Attached hereto as Exhibit "E" is a true and correct REDACTED copy of the attachment to the January 10, 2019 email correspondence from BORLAND to Co-Defendant VOLHEIM containing the verification of debt documents.

19.

On January 16, 2019, Defendants, drafted, prepared and emailed and/or caused to be drafted, prepared and emailed correspondence to Plaintiff(s) counsel further availing themselves to the jurisdiction of this court and demanding payment

of an amount of $4,950.00.  A true and correct copy of the January 16, 2019 email

correspondence is attached as Exhibit "F"

20.

On January 22, 2019, the undersigned counsel drafted and sent to Co-

Defendant, VOLHEIM, an email correspondence disputing Defendant(s) claims,

providing Defendant(s) with citation to case law in this jurisdiction and seeking an

explanation for Defendant(s) alleged claim that Plaintiffs sought collection or an

obligation not owed by Defendant YADIRY. A true and correct copy of the

January 22, 2019 email correspondence is attached as Exhibit "G"

21.

On January 23 2019, Defendants, drafted, prepared and emailed and/or

caused to be drafted, prepared and emailed correspondence to Plaintiff(s) counsel

further availing themselves to the jurisdiction of this court and demanding payment

of an amount of $3,900.00.  A true and correct copy of the January 23, 2019 email

correspondence is attached as Exhibit "H"

22.

In regard to the disputed FDCPA claim, on the January 23, 2019 email

correspondence (Exhibit "H"), Co-Defendant, VOLHEIM, stated that "we will be

advancing at least to the summary judgment stage in litigation. I do not need to outline the costs for your Client in order to participate in litigation to that point."

23.

On January 25, 2019, the undersigned counsel drafted and sent an email correspondence to Defendants attempting to resolve the alleged claims and attempting to have Defendant(s) justify the damages begin demanded from Plaintiffs.  A true and correct copy of the January 25, 2019 email correspondence is attached as Exhibit "I".

24.

On January 25, 2019, Defendants responded as follows:

"Since your client is clearly concerned about our billing rate and work-product I have kept my emails to you brief. As very clearly highlighted in your last email, you do Plaintiff's work too. As such I will give you the benefit of the doubt that you know where these things resolve themselves at. The $3,900 demand is a far cry compared to what your clients will pay to defend this action."

25.

On each communication made by Plaintiff(s) with Defendant, YADIRY, Plaintiff(s) acted in compliance with the Fair Debt Collections Practices Act.

26.

Plaintiff(s) have not engaged in any conduct in violation of any provision of the Fair Debt Collections Practices Act.

27.

Plaintiff(s) communication(s) with Defendant, YADIRY, did not violate 15 U.S.C. 1692(e) of the Fair Debt Collections Practices Act.

28.

Plaintiff(s) communication(s) with Defendant, YADIRY, did not violate 15 U.S.C. 1692(f) of the Fair Debt Collections Practices Act.

29.

Plaintiff(s) maintain procedures reasonably adopted to avoid violations under the Fair Debt Collections Practices Act.

30.

Upon information and belief, Defendant, YADIRY, suffered no actual damages as a result of conduct alleged in Defendant(s) September 26, 2018 correspondence and emails from Defendants attached hereto.

31.

The alleged conduct in Defendants' September 26, 2018 correspondence, email correspondence does not support a claim under the Fair Debt Collections Practices Act.

32.

Upon information and belief, Defendant, YADIRY individually and by and through counsel VOLHEIM and SULAIMAN LAW, did not conduct an appropriate investigation or due diligence prior to making its demand upon Plaintiff(s).

33.

Upon information and belief, Defendant, YADIRY, individually and by and through counsel VOLHEIM and SULAIMAN LAW, did not conduct a reasonable inquiry into the facts and/or law before making its demand upon Plaintiff(s).

34.

Upon information and belief, Defendant, YADIRY, individually and by and through counsel VOLHEIM and SULAIMAN LAW, knew or had constructive knowledge that the conduct complained of in Defendants September 26, 2018

correspondence and email correspondence did not amount to an actionable claim under the Fair Debt Collection Practices Act.

35.

Upon information and belief, Defendant, YADIRY, individually and by and through counsel VOLHEIM and SULAIMAN LAW, drafted, prepared, faxed, emailed, and mailed and/or caused to be drafted, prepared, faxed, emailed and mailed the September 26, 2018 correspondence and/or email correspondence in an attempt to deprive Plaintiffs of property by improper and/or unlawful means.

36.

Defendants have acted in bad-faith through the threat of litigation reasonably calculated to cause fear of economic loss to Plaintiffs.

37.

Defendants have acted in bad-faith through the threat of litigation with the intent to extort money from Plaintiff.

38.

Defendant(s) bad faith and harassment are grounds for an award of all reasonable attorney's fees in relation to the work expended and costs pursuant to 15 U.S.C. §1692k(a)(3) and/or the Court's inherent powers.

## CLAIM FOR DECLARATORY JUDGMENT

### 39.

Plaintiffs incorporate by reference all of the above paragraphs of this Complaint as though fully stated herein.

### 40.

A real and actual controversy presently exists between the parties as contemplated pursuant to the provisions of 28 U.S.C. § 2201.

### 41.

Pursuant to the provisions of 28 U.S.C. § 2201, this Court has the power to declare the rights and liabilities of the parties and give such other relief as may be necessary.

### 42.

Absent a judicial declaration, Plaintiffs will suffer a significant financial burden of defending an improper lawsuit.

WHEREFORE, Plaintiffs, Law Office of Brett M Borland, P.C. and Brett Borland, individually, pray for judgment against Defendants as follows and request this honorable Court to:

1. Determine and adjudicate the rights and liabilities of the parties with respect to Defendants' alleged claims under the Fair Debt Collection Practices Act;

2. Determine and adjudicate that Plaintiff(s) have not violated the Fair Debt Collection Practices Act;

3. Determine and adjudicate that Plaintiff(s) letter does not violate the Fair Debt Collection Practices Act;

4. Determine and adjudicate that Defendant(s) did not conduct an appropriate investigation or due diligence prior to making its demand upon Plaintiff(s);

5. Determine and adjudicate that Defendant(s) did not conduct a reasonable inquiry into the facts and/or law before making its demand upon Plaintiff(s);

6. Determine and adjudicate that Defendant(s) knew or had constructive knowledge that the conduct complained of in Defendants September 26, 2018 correspondence and email correspondence did not amount to an actionable claim under the Fair Debt Collection Practices Act;

7. Determine and adjudicate that Defendant(s) have attempted to obtain Property from Plaintiff(s) or deprive Plaintiff(s) of Property by improper and/or unlawful threat of litigation;

8. Determine and adjudicate that Defendants acted in bad faith and for the purpose of harassment;

9. Determine and adjudicate that Defendants acted in bad-faith through the threat of litigation reasonably calculated to cause fear of economic loss to Plaintiffs.

10. Determine and adjudicate that Defendants have acted in bad-faith through the threat of litigation with the intent to extort money from Plaintiff.

11. Determine and adjudicate that Plaintiff(s) have procedures reasonably adopted to avoid violations under the Fair Debt Collection Practices Act;

12. Award Plaintiff(s) all Costs and Reasonable Attorneys' fees against Defendants, jointly and severally; and

13. Grant Plaintiff(s) such other relief as this Court deems just and proper.

This January 27, 2019.

s/John M. Duffoo, Esq.
GA Attorney Bar No. 231973
Attorney for Plaintiffs
Business Law Firm of John M. Duffoo
P.O. Box 767355
Roswell, GA 30076
Telephone: (770) 312-6160
Email: John@Duffoolaw.com

## LOCAL RULE 5.1 CERTIFICATION

Counsel certifies that the Complaint for Declaratory Judgment was prepared in accordance with the type and font selections approved by Local Rule 5.1.

This January 27, 2019.

s/John M. Duffoo, Esq.
GA Attorney Bar No. 231973
Attorney for Plaintiffs
Business Law Firm of John M. Duffoo
P.O. Box 767355
Roswell, GA 30076
Telephone: (770) 312-6160
Email: John@Duffoolaw.com

.

# EXHIBIT "A"

# Sulaiman Law Group, LTD

DEDICATION | INNOVATION | COMPASSION | EXCELLENCE

2500 South Highland Avenue, Suite 200, Lombard, Illinois 60148
Tel 630.575.8181  -  Fax 630.575.8188

September 26, 2018

*Via facsimile and US mail*

Law Office of Brett M. Borland, P.C.
Attention: Brett M. Borland and Janne McKamey
2440 Sandy Plains Road
Building One, Suite 200
Marietta, Georgia 30066

RE:    **Yadiry Pena Jiminez a/k/a Yadiry Benavides, Your File Number 3778270**

Counselors,

Sulaiman Law Group, Ltd. has been retained by Yadiry Pena Jiminez ("our Client") related to various allegations against Law Office of Brett M. Borland, P.C ("your firm"). A brief overview of her allegations are outlined below. Please consider this correspondence a formal demand for your firm to cease and desist any direct communications with our Client. All future correspondences should be directed through our office.

Our Client is a consumer who is alleged to owe an obligation to Concord Chase Apartments ("CCA") related to a residential apartment lease. To make clear, our Client disputes any financial obligation to CCA. However, CCA has turned a balance of $3,717.00 ("subject consumer debt") over to your firm for collections. On or around September 6, 2018, your firm caused to be sent a correspondence seeking payment of the subject consumer debt.

Because your firm is collecting on a consumer obligation allegedly owed to CCA it is subject to the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §1692 *et seq.* In your correspondence sent to our Client, you identify yourself as a debt collector that is attempting to collect a debt. The correspondence violates numerous provisions of the FDCPA. Most notably, it purports to be reviewed and signed by two attorneys in the signature line, yet bears only one signature. Our Client alleges this is false and misleading conduct. Moreover, the correspondence seeks collection of an obligation not owed by our Client.

Our Client has instructed that we represent his interests through our local counsel in Georgia. Should your firm wish to discuss what appear to be straight-forward violations of law with supporting evidence, please contact me directly to discuss resolution by October 18, 2018. Hearing nothing by that date we will proceed at our Client's request.

Sincerely,

Nathan C. Volheim, Esq. #6302103
Sulaiman Law Group, Ltd.
2500 South Highland Avenue, Suite 200
Lombard, Illinois 60148
(630) 575-8181 x113 (phone)
(630) 575-8188 (fax)
nvolheim@sulaimanlaw.com

# EXHIBIT "B"



## LAW OFFICE OF
# BRETT M. BORLAND, P.C.
P.O. Box 312057
Atlanta, Georgia 31131

09/06/2018

**PERSONAL & CONFIDENTIAL**

Yadiry Pena Jiminez
1332 MARCELLE HEIGHTS PL
Norcross GA 30093

Creditor: CONCORD CHASE APTS
Creditor Acct. No.: 901
Balance:        $3,717.00
Address I.D.    11831652

Our File No.:   3778270

     This law firm has been retained to collect the above-referenced account. As such, this firm is authorized to handle the collection of your debt. Your account is in default.

     Unless you notify this office within 30 days after receiving this notice that you dispute the validity of this debt or any portion thereof, this office will assume this debt is valid. If you notify this office in writing within 30 days from receiving this notice that you dispute the validity of this debt or any portion thereof, this office will obtain verification of the debt or obtain a copy of a judgment and mail you a copy of such judgment or verification. If you request of this office in writing within 30 days after receiving this notice this office will provide you with the name and address of the original creditor, if different from the current creditor.

     It is important that this matter receives your attention and that you contact us to discuss a resolution of the unpaid balance. You may contact my staff at (888) 281-6788.

     This is an attempt to collect a debt. Any information obtained will be used for that purpose. This is a communication from a debt collector.

**NOTICE: SEE REVERSE SIDE FOR IMPORTANT INFORMATION.**

Telephone    (888) 281-6788
Facsimile    (678) 385-5357

Physical Address
2440 Sandy Plains Road
Building One, Suite 200
Marietta, Georgia 30066

~~+ Brett M. Borland~~
+ Janne McKamey

ɪʏ Admitted in Georgia,
    Arizona and Pennsylvania
+ Admitted in Georgia
  and Tennessee

Sincerely,

Law Office of Brett M. Borland, P.C.

Brett Borland, Esquire
Janne Mckamey, Esquire

This communication is an attempt to collect a debt by a debt collector.
Any information obtained will be used for that purpose.

# EXHIBIT "C"

**From:** Nathan Volheim <nvolheim@sulaimanlaw.com>
**Sent:** Thursday, January 10, 2019 9:24 AM
**To:** Kiran Wadia <kwadia@sulaimanlaw.com>; 'info@bborlandlaw.com' <info@bborlandlaw.com>;
'brett@bborlandlaw.com' <brett@bborlandlaw.com>; 'jymckameyatty@yahoo.com' <jymckameyatty@yahoo.com>
**Cc:** Teddy Hatzidimitriadis <thatz@sulaimanlaw.com>
**Subject:** RE: Re: Yadiry K. Benavides

Mr. Borland and Ms. McKamey,

Good morning. Hope this email finds you well. As you will recall my office sent your office the attached correspondence back on September 26, 2018. We have not heard back from you regarding the same. As a professional courtesy we wanted to do a final check-in before proceeding at our Client's request. Please advise.

Nathan C. Volheim, Esq.
Director of Team Eagle
Atlas Consumer Law - Division of Sulaiman Law Ltd.
2500 S. Highland Avenue, Suite 200
Lombard, Illinois 60148
Phone (630) 568-3056
Fax (630) 575 - 8188
Website: http://www.atlasconsumerlaw.com/
Email: nvolheim@sulaimanlaw.com

*Licensed to practice in the State of Illinois and all the United States District Courts in Colorado, Illinois, Indiana, Michigan, Texas, and Wisconsin.*





CONFIDENTIALITY: The information contained in this e-mail message and accompanying documents are covered by the Electronic Communications Privacy Act, 18 U.S.C. 2510-2521 and contains confidential information intended only for use by the specified individual(s) and/or entity(s) named above. If you are not the intended recipient, or the employee or agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this e-mail in error and any review, dissemination, copying or the taking of any action based on the contents of this communication and/or attached documents is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone or email and delete the original message without making a copy. This message, together with any attachments, is intended for the use of the individual or entity to which it is addressed and contains information that is LEGALLY PROTECTED BY THE ATTORNEY-CLIENT PRIVILEGE, CONFIDENTIAL AND EXEMPT FROM DISCLOSURE.

3

**NOT LEGAL ADVICE:** If you are not an existing client of Sulaiman Law Group, Ltd., do not construe anything in this e-mail to make you a client of Sulaiman Law Group, Ltd. Any information in this communication is for discussion purposes only, and is not offered as legal advice. There is no right to rely on the information contained in this communication and no **attorney-client relationship is formed.**
**CIRCULAR 230 DISCLAIMER:** To ensure compliance with requirements imposed by the IRS, we inform you that any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding tax-related penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or tax related matter(s) addressed therein. Effective June 21, 2005, newly issued Internal Revenue Service regulations require that certain types of written advice include a disclaimer. To the extent the preceding message contains written advice relating to a Federal tax issue, the written advice is not intended or written to be used, and it cannot be used by the recipient or any other taxpayer, for the purposes of avoiding Federal tax penalties, and was not written to support the promotion or marketing of the transaction or matters discussed herein.

**From:** Kiran Wadia
**Sent:** Wednesday, September 26, 2018 12:03 PM
**To:** 'info@bborlandlaw.com' <info@bborlandlaw.com>
**Cc:** Nathan Volheim <nvolheim@sulaimanlaw.com>; Teddy Hatzidimitriadis <thatz@sulaimanlaw.com>
**Subject:** Re: Yadiry K. Benavides

Good Afternoon,

See Attached.


Kiran


--Certified Virus Free by 4SecureMail.com ICSA-Certified Scanner--

4

# EXHIBIT "D"

and/or attached documents is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone or email and delete the original message without making a copy. This message, together with any attachments, is intended for the use of the individual or entity to which it is addressed and contains information that is **LEGALLY PROTECTED BY THE ATTORNEY-CLIENT PRIVILEGE, CONFIDENTIAL AND EXEMPT FROM DISCLOSURE.**

**NOT LEGAL ADVICE:** If you are not an existing client of Sulaiman Law Group, Ltd., do not construe anything in this e-mail to make you a client of Sulaiman Law Group, Ltd. Any information in this communication is for discussion purposes only, and is not offered as legal advice. There is no right to rely on the information contained in this communication and no attorney-client relationship is formed.
**CIRCULAR 230 DISCLAIMER:** To ensure compliance with requirements imposed by the IRS, we inform you that any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding tax-related penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or tax related matter(s) addressed therein. Effective June 21, 2005, newly issued Internal Revenue Service regulations require that certain types of written advice include a disclaimer. To the extent the preceding message contains written advice relating to a Federal tax issue, the written advice is not intended or written to be used, and it cannot be used by the recipient or any other taxpayer, for the purposes of avoiding Federal tax penalties, and was not written to support the promotion or marketing of the transaction or matters discussed herein.

From: Brett Borland <brett@bborlandlaw.com>
Sent: Thursday, January 10, 2019 4:32 PM
To: Nathan Volheim <nvolheim@sulaimanlaw.com> .
Subject: RE: Re: Yadiry K. Benavides

Mr. Volheim,

We received your previous letter requesting my firm cease and desist from any direction communication with your client. I fail to see, however, where my firm violated the FDCPA. Your letter makes no mention of the basis of your client's dispute. Please find attached, documents validating your client's debt. Further, your claim that our letter violates the FDCPA because only one attorney's signature was present is completely new to me. If you would, please send me any case law that supports this position. If you proceed with suit having no basis in law, I believe your complaint will be frivolous and sanctionable under Rule 11.

Respectfully,



# BRETT M BORLAND
CEO

📞 770-610-2210   ✉ BRETT@BBORLANDLAW.COM

📍 2440 Sandy Plains Rd  Bldg 1, Suite 200 Marietta, GA 30066

**THIS COMMUNICATION IS FROM A DEBT COLLECTOR ATTEMPTING TO COLLECT A DEBT. ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.**

**THIS ELECTRONIC MAIL MAY BE SUBJECT TO THE ATTORNEY-CLIENT PRIVILEGE OR THE ATTORNEY WORK PRODUCT PRIVILEGE OR OTHERWISE CONFIDENTIAL. ANY DISSEMINATION, COPYING OR USE OF THIS E-MAIL BY OR TO ANYONE OTHER THAN THE DESIGNATED AND INTENDED RECIPIENT(S) IS UNAUTHORIZED. IF YOU HAVE RECEIVED THIS MESSAGE IN ERROR, PLEASE DELETE IT FROM YOUR SYSTEM IMMEDIATELY.**

**EXHIBIT "E"**

**Concord Chase**
300 Hurt Rd SE
Smyrna, GA  30082-2718

Pena-Jiminez, Yadiry
███████████
Smyrna, GA ███████

## Final account statement

| Ledger Account at move-out | |
|---|---|
| Gas Reimbursement | 16.00 |
| Late Charges | 460.00 |
| Legal Fees - Pena-Jiminez | 200.00 |
| Pest Control | 3.00 |
| Rent, unit 901 from Price optimizer | 1,801.00 |
| Trash Fee | 7.00 |
| Water/Sewer- 3 Bedroom | 90.00 |
| Balance at move-out | 2,577.00 |
| * See the itemized charges for a complete listing of the work. | |

| Deposit Activities | |
|---|---|
| OSP IRD Deposit | (200.00) |
| Total Deposits on hand | (200.00) |

| Additional charges/credits/payments after move-out | |
|---|---|
| Clean Refrigerator | 20.00 |
| Full Clean | 75.00 |
| Reletting Fee | 995.00 |
| Remove Furniture $50 a piece | 250.00 |
| Total additional charges / credits / payments | 1,340.00 |

| Final Account balance | |
|---|---|
| Balance at move-out | 2,577.00 |
| Total Deposits | (200.00) |
| Total additional charges / credits / payments | 1,340.00 |
| Total account balance due | 3,717.00 |

| FAS Prepared | |
|---|---|
| Date | 01/24/2018 |
| User | Bautista, Idai |

| Pay to | |
|---|---|
| Concord Chase | |
| 300 Hurt Rd SE | |
| Smyrna, GA  30082-2718 | |

| Lease Information - Unit 0-901 | |
|---|---|
| Move-in | 12/23/2016 |
| Notice given | 01/08/2018 |
| Lease expires | 11/13/2017 |
| Move-out | 01/20/2018 |
| Move-out reason | Evicted for non-payment of rent |

Thank you for staying with us. Your final account statement resulted in the balance above. Attached are the itemized charges resulting from the inspection. Please remit your payment to the management office. If we do not receive your payment within 14 days, your account will be turned over to our collection agency. We are always willing to make reasonable payment plans. If you have any questions, please feel free to contact the management office.

Manager

Onesite - Final account statement : Yadiry Pena-Jiminez

# GAA
(GEORGIA APARTMENT ASSOCIATION)

Apartment Rental Contract

FORM VALID FOR
GEORGIA APARTMENT
ASSOCIATION
MEMBERS ONLY

This Apartment Rental Contract is a lease between the Owner of the Apartment Community and the Residents who are leasing the apartment. The General Provisions of the lease which follow the signatures at the bottom of this page and any separate addenda signed by the parties are incorporated into and become part of this lease. Paragraph numbers on this page correspond to paragraph numbers in the General Provisions.

Lease Date: **January 15, 2016**
Management: **Eighteen Capital Group**

☐ Owner  ☒ Management Co. as Agent for Owner
Apartment Community Name: **SBV Atlanta-Concord Chase, LLC**
Apartment No.: ▮▮▮▮
Apartment Address: ▮▮▮▮▮▮▮▮▮▮▮ Smyrna, GA 30082
Residents/Tenants: **Yadiry Pena-Jiminez**

Other Occupants of Apartment: ▮▮▮▮▮▮▮▮▮▮▮      ▮▮▮▮▮▮▮▮▮

Par. 1.  Lease Term: **12** Months and _____ Days
         Beginning Date: **01/15/2016**                     Ending Date: **01/14/2017**
Par. 3.  Rent Due Monthly          $ **800.00**
         Pro Rated Rent Due at Lease Signing $ **439.00**
         Dates of Prorated Rent **01/15/2016** to **01/31/2016**
         Month to Month Fee    $ **100.00**
         Rent is Payable to **Concord Chase Apartments**          (Name on Check or Money Order)
Par. 4.  Late Fees and Insufficient Funds Fees
         Date on Which Rent is Late          **5**
         Amount of Late Fee          $ **100.00** or _____ % of Rent
         Per Day Late Fee            $ **10.00** per day after **5** day of the month
         Returned or Insufficient Check Fee ☒ Service Fee of $ **35.00** or ☐ 5% of Amount of Check plus ☐ Bank Service Fee of
         $ _____ [Amount charged by Bank to Management for Charge Back]
Par. 5.  Re-Key Lock Charge          $ **45.00**
         Non-refundable Lease Fee    $ **75.00**
         Security Deposit            $ **200.00**
         Bank Name                                                (Where Security Deposit Kept)
Par. 6.  How Much Notice Required To Non-Renew Lease Prior To End of Initial Lease Term **60** Days
         Renewal Period          ☐ Month to Month (1 month at a time) Renewal   ☐ Bi-Monthly (2 months at a time) Renewal
         Notice Required to End Renewal Period   ☒ 30 days to end Month to Month Renewal   ☐ 60 days to end Bi-Monthly Renewal
Par. 7.  Early Termination Option: Amount of Notice Required for Electing Early Termination **60** Days Written Notice
Par. 9.  Disclosure Notice of Owner or Managing Agent and Equal Housing Opportunity Policy
         Name of Managing Agent for Owner **SBV-ATLANTA CONCORD CHASE**
         Address of Agent Authorized to **300 Hurt Rd SE Smyrna, GA 30082**
         Manage Apartment Community
         Name of Owner or Registered Agent
         Authorized to Receive Notices and **18 Capital Group**
         Lawsuits
         Address of Owner or Registered Agent
         Authorized to Receive Notices and
         Lawsuits
         Corporate Name of GREC Licensee **18 Capital Group**
         GREC Corporate License No.
Par. 17. Flood Disclosure  ☒ Not Applicable   ☐ Apartment has been flooded previously
Par. 34. Special Stipulations: Resident will pay $800.00 rent, plus $55.00 of water, plus $4.00 of trash, $2.00 pest control , and $10.00 of hot water fee for a total of $871.00. Resident will receive $439.00 off January 2016 & $361.00 off February 2016 for a total $800.00 free.

Signatures of Parties:
Management
**Eighteen Capital Group**
Name of Management

By: _____
Signature of Management Representative Name

As: _____ (Job Title)

Residents

_Yadiry Pena Jiminez_ (Resident Signature)
Printed Name of Resident: _____

_____ (Resident Signature)
Printed Name of Resident: _____

_____ (Resident Signature)
Printed Name of Resident: _____

_____ (Resident Signature)
Printed Name of Resident: _____

Copyright © 10/2016 - Atlanta Apartment Association, Inc. - Form # 1301
All Rights Reserved

GENERAL PROVISIONS FOLLOW          011420160370401          Page 1 of 8

General Lease Provisions.

The Owner is the landlord of the property, and the Resident is the tenant. The apartment community is managed for the Owner by its Managing Agent.

The lease is legally effective on the date it is signed, regardless of whether it was signed before or after the Resident moves into the apartment. There is no conditional three day right to rescind or void the contract once it is signed, and the Resident is legally bound to pay all rent, fees, and other charges that come due, regardless of whether the Resident continues to occupy the apartment. The Lease Date is the day on which the lease was signed and became effective as a contract.

The lease is a legally binding contract that creates the relationship of landlord and tenant for the full duration of the lease term at the rental rate stated above. Any addenda signed by the Owner and Resident are also part of this Apartment Rental Contract.

The Owner provides the apartment to the Resident in exchange for payment of monthly rent. The Resident's obligation to pay rent is independent of any other obligation of Landlord in the lease.

Listed above are important terms, conditions, and payment amounts. They are listed at the beginning of the lease to provide the parties with an easy reference. Each of the first page terms correspond to important lease provisions that follow below. Paragraph references on the first page correspond to the paragraph number of the General Lease provisions that follow.

Important Information About Ending The Lease and Management's Right to Increase the Rent During Any Extension Period. This lease does not end automatically at the end of the initial lease term. The Resident must give a proper non-renewal notice to end the lease as provided in Par. 6. The lease will be extended or renewed for an additional period of time stated in Par. 6. The lease continues to renew until the proper non-renewal notice is given. If the lease is renewed or extended, the Resident will be responsible for paying an additional Month-to-Month Fee and may also pay a higher rent than the rent specified in Par. 3, if Management gives notice of the higher rent amount.

The apartment shall only be occupied by Residents and the occupants listed on page 1, and any other occupants not listed above are unauthorized to live in the apartment.

1.    Term. The initial lease term of the lease is for the number of months and days specified in Par. 1. The initial term of the lease begins and ends at noon on the days specified in Par. 1 but will be automatically renewed on either a month to month or bi-monthly basis as stated in Par. 6. RESIDENT MAY NOT TERMINATE THIS LEASE PRIOR TO THE END OF THE INITIAL TERM EXCEPT IN STRICT COMPLIANCE WITH PARAGRAPH 7 or as otherwise provided by law.

2.    Possession. Rent shall abate until possession is granted to Resident. Resident may void or rescind this lease if possession is not granted within seven (7) days from the start of the lease term. Management is not liable for any delay in possession. Resident shall give Management written notice of his or her election to void or rescind the contract.

3.    Rent. Resident shall pay rent in advance on the 1st day of each month at the management office as provided in Par. 3. The first month's prorated rent shall be due at the time this lease is signed as provided in Par. 3. If this lease is extended or renewed under Paragraph 6 without signing a new lease, Resident shall owe a month-to-month fee in addition to the monthly rent due during any extension or renewal period.

CASH PAYMENTS WILL NOT BE ACCEPTED, AND NO MANAGEMENT EMPLOYEE IS AUTHORIZED TO ACCEPT A CASH PAYMENT UNDER ANY CIRCUMSTANCES. RESIDENT MAY NOT RELY ON ANY STATEMENT MADE TO HIM BY A MANAGEMENT RESPRESENTATIVE THAT CASH WILL BE ACCEPTED.

All rent shall be paid by personal check, cashier's check, or money order. Management shall have the right to establish or provide for payment by credit card, debit card, electronic funds transfer, online payment portal, or designated online payment system and software, but Management does not have the right to make payments by these means unless specifically authorized by Management. Management shall have the right to designate the specific manner or form of payment that will be accepted, and no other form of payment shall be acceptable than those specified by Management. Checks and money orders shall be made payable to the order of the business entity specified in Par. 3. Third party checks (those which are made payable to someone other than Management) and partial payments are not allowed. All other damages, utilities, fees, or charges owed by Resident and due under this lease are considered to be additional rent.

The amount of rent specified in Par. 3 is the amount due each month unless Management has given the Resident a rental concession or discount from the rent, either in the Special Stipulations to this lease or in a separate addendum. If there are rental concessions granted, the Resident will or may lose them if in default or breach of this lease and will be obligated to pay the full amount of rent specified in Par. 3. If in default or breach of the lease, the Resident may have to repay the rental concessions under certain specified conditions.

4.    Late Payments and Checks with Insufficient Funds. Time is of the essence. After close of business on the last day of the grace period specified in Par. 4, late fees shall be due in the amount specified.

Resident shall pay Management an insufficient funds check service fee for each returned or NSF check, plus an additional fee equal to the fee charged to Management by the bank. If no box is checked in Par. 4 that specifies the amount of the service fee, then the insufficient funds service fee is five per cent (5%) of the face amount of the check, plus the fee charged by the bank. At Management's option, all late rent, NSF checks, and future rents due after an NSF check must be paid by money order or certified funds from a bank. The parties agree that bank service, NSF, and late fees are reasonable compensation for delay, administrative costs, and time in collecting past due rent, are not penalties, and that such costs are difficult to estimate accurately.

5.    Lease Fees & Security Deposit. Resident must pay the amounts specified in Par. 5 for re-keying locks, any non-refundable lease fees, or security deposits. A re-keying lock fee is due for each lock that must be re-keyed if all keys are not returned. The non-refundable lease fee is not a security deposit, is not refundable, and does not reduce Resident's liability for unpaid rent, damages exceeding normal wear and tear, or other charges that come due under the lease. Any security deposit will be refunded as provided by law but may be applied to any charges due under this lease. The deposit will either be protected by a surety bond on file with the Clerk of Superior Court or deposited in the bank specified in Par. 5. Interest earned on such deposits belongs to Management.

Management shall have the right to apply any security deposit held to money or a debt owed by the Resident to Management. Management is not restricted to or limited in how the security deposit is applied if money is owed, and the deposit may applied to rent, damages exceeding normal wear and tear, unpaid utilities, or any other fee, charge, or debt owed by Resident. Management may apply a pet or animal deposit to unpaid rent or damages exceeding normal wear and tear that were not caused by a pet or animal.

Resident shall have no right to use or designate a security deposit as payment of rent or other fees and charges which are due, as provided by O.C.G.A. 44-7-33(b). Resident agrees to cooperate with Management in scheduling and performing Move-In and Move-Out inspections and noting any existing damages or objecting to Management's list of damages exceeding normal wear and tear.

6.    Renewal Term and Notice of Non-Renewal to End the Lease. Either party may non-renew and terminate this lease at the end of the initial term by giving a written non-renewal notice prior to the end of the initial lease term. If such non-renewal notice is not given, then this lease will be extended as provided in Par. 6 on  either a Month-to-Month basis (one month at a time) until either party gives a proper 30 day notice; or on a Bi-Monthly basis (two

Copyright © 10/2015 - Atlanta Apartment Association, Inc. - Form # 1301
All Rights Reserved

011420160370402

months at a time) until either party gives a prop.  0 day notice in writing that terminates the lease. U.  s otherwise allowed by Landlord, the lease shall terminate at the end of a calendar month.

Management shall have the right to increase the rent due in any extension or renewal term by giving written notice at least 15 days prior to the date on which a non-renewal notice must be given in order to end the initial term or any subsequent renewal or extension period.

If not specified in Par. 6, then a 30 day written notice is required to end the initial term or any renewal or extension period as of the end of a calendar month. Management employees are not authorized to accept a verbal notice of non-renewal or termination from the Resident, and the Resident has no right to rely on a Management employee's statement that a verbal notice is acceptable. Resident's non-renewal or termination notice must be in writing, dated, signed, and specify the move-out date. Resident should confirm Management's receipt of the notice with the authorized signature of a Management representative using Management's notice of intent to vacate form. Resident should keep a signed receipt of the non-renewal notice for his personal records in case of any dispute as to whether such notice was given and received. If Resident does not obtain a signed receipt of such notice from Management, or if Management does not have a signed original non-renewal notice from Resident, then it will be presumed that Resident failed to give a proper written notice.

7.    Resident's Early Termination Option.  Resident can end all liability for rent under this lease (but not liability for damages exceeding normal wear and tear, or liability for unpaid utilities) and vacate before the end of the initial lease term stated in Par. 7 only by doing all of the following things required in this paragraph. If all of the following conditions are not performed, then the lease remains in effect for the full term, and Resident shall be liable for breach of the rental agreement as provided in Paragraph 26. If Resident skips, abandons, or is evicted from the apartment without complying with this paragraph, then Resident is in default and responsible for rent and liquidated damages (if applicable) as provided under Paragraph 26, any other fees or charges due, and all damages and cleaning fees in excess of normal wear and tear. Management employees are not authorized to make a verbal statement that waives the notice and termination fees, and the Resident has no right to rely on a Management employee's statement that Resident will not have to pay such fees or comply with this provision in order to terminate the lease early. Any waiver of the notice or fees required under this provision must be in writing, dated, and signed by all parties. Resident's election to use or not use this provision is purely voluntary.

To end the lease early, Resident MUST do EACH of the following: 1) pay all monies currently due; 2) give written notice in the amount specified in Par. 7 of intent to vacate prior to the first day of the month and to take effect as of the last day of a calendar month; 3) pay all rent due through the notice period preceding the early termination date; 4) pay an additional early termination or lease cancellation fee equal to one month's rent as liquidated damages; vacate the leased premises on or before the specified termination date, remove all occupants and possessions, and physically hand the keys to a Management representative; and 5) abandon, waive, and release a claim to the return of any security deposit, which shall become Management's.

If the length of the Early Termination notice is not specified in Par. 7 on the first page, then a 30 day written notice is required. Resident can move-out earlier than the termination date following the notice period in Par. 7, but Resident must turn in all keys, remove all occupants and personal property, pay all rent due through the required non-renewal notice period, pay the one-month termination or lease cancellation fee, and comply with all other requirements. Keys must be physically handed to a representative of Management and may not be left in the apartment or a night rent drop box.

If Resident elects to exercise his or her right to Early Termination, Resident is not entitled to a refund of any rent, notice or termination fees, or security deposit, even if the apartment is re-let to a new Resident prior to the end of the notice period. Resident's election to exercise this early termination option either by giving proper notice and paying all sums due or by giving proper notice and signing an agreement to terminate early and pay the sums due at a later date are binding and shall not be reduced or set-off by any money or rent Management receives from re-letting the apartment to a new or subsequent Resident.

Military Transfers and Lease Terminations.  A Resident (including a Resident's spouse) who is a service member on active duty or is called to active duty in the regular or reserve component of the U.S. Armed Forces, U.S. Coast Guard, or National Guard, shall have the right to end this Apartment Rental Contract early by giving a 30 day written notice, paying all rent due through the notice date, and providing a copy of the official military orders or written verification signed by the service member's commanding officer or by providing base housing orders as provided in O.C.G.A. Section 44-7-22, if the service member is:

1.    Ordered to federal duty for a period of 90 days or longer;
2.    Receives a permanent change of station orders to move at least 35 miles away from the rental housing;
3.    Is released from active duty after leasing housing and must move 35 miles or more away from the service member's home of record prior to entering active duty;
4.    After entering into this rental agreement, the service member becomes eligible to live in government quarters or the failure to move to government quarters will result in a forfeiture of the service member's basic allowance for housing;
5.    Receives temporary duty orders or temporary change of station orders or state active duty orders for a period exceeding 60 days that is at least 35 miles away from the location of the rental housing; or
6.    Receives orders after signing the lease but before taking possession of the rental housing.

8.    No Assignment/Subletting.   Resident may not sublet or assign the lease.

9.    Disclosure Notice of Owner or Managing Agent and Equal Housing Opportunity Policy.

The name and address of company or party authorized to manage the apartment community for the owner is specified in Par. 9. The name and address of the owner or owner's registered agent who is authorized to receive notices and lawsuits against the Landlord is specified in Par. 9. Lawsuits filed against the owner or Management shall be filed and served as provided by law or as contractually agreed to by Resident.

The Corporate Broker's Name of the Licensed Managing Agent and Broker's license number as required by the rules of the Georgia Real Estate Commission (Ga.R. & Reg. 520-1-.10) is specified in Par. 9.

Equal Housing Opportunity Policy.  The apartment owner and Management provide equal housing opportunity for qualified applicants and do not discriminate on the basis of race, color, religion, sex, national origin, familial status, disability, or any other legally recognized status in the State of Georgia. It is the owner's and Management's policy to provide reasonable accommodations in the apartment community's operational policies and procedures and to permit the Resident to make reasonable modifications that are necessary for the Resident and related to the disability for persons with a demonstrated disability. The Resident must request and obtain permission from the owner or management for any accommodation or modification prior to implementing the same. In general, the cost or expense of physical modifications to the apartment or apartment community is the responsibility of the Resident, unless the applicable law requires the owner or Management to absorb or be responsible for the cost of such modifications. A Resident or occupant with a demonstrated disability is allowed to have an assistance animal to assist with the person's disability. A disabled Resident or occupant is allowed to have an assistance animal which has not been trained as a service animal unless the animal has a history of dangerous, vicious, or unsafe behavior. If the nature of the disability is not obvious or apparent or the manner in which the animal will provide assistance is not clear, Management has the right to request additional information regarding how the animal will assist with the resident's disability. The Resident does not have an absolute right to the specific accommodation or modification requested, and Management has the right to offer a substitute or alternate accommodation or modification with conditions that will provide adequate assurance for the safety, health, and well being of other Residents, occupants, social guests, invitees, and

Copyright © 10/2015 - Atlanta Apartment Association, Inc. - Form # 1301
All Rights Reserved

011420160370403

Management employees. No Additional Rent, refundable Fee, or Animal Security Deposit is required from Residents or occupants who are disabled and have an approved service or assistance animal; however, the Resident is responsible for any and all damages and cleaning fees exceeding normal wear and tear caused by such animal.

10.   Utilities Are Resident's Responsibility.   Resident is responsible for payment of all natural gas, electricity, water and sewer, telephone, cable, satellite or other utilities and services to the apartment unless specified otherwise in Paragraph 34 or in a utility addendum which is made a part of this lease. Resident gives Management the right to select any utility provider and change the same without notice. Resident shall promptly establish all utility and service accounts to be paid by Resident in his name at the start of the lease and shall not allow water and sewer, electricity, or natural gas to be shut off or billed to Management. Resident shall promptly pay any billing for utilities or other services charged to Management upon notification. Resident's failure to pay all utility services or to establish an account with a utility provider is a material breach of the lease for which Management has the right to terminate the right of occupancy or lease.

     **   Important Disclosure Regarding Management's Right to Select the Natural Gas Marketer (Provider).   Resident (the Tenant) authorizes Management (the Landlord) to act as Resident's agent for the limited purpose of selecting the Resident's natural gas marketer, to authorize the natural gas marketer to obtain credit information on the Resident, if required by the marketer, and to enroll the Resident on the marketer's standard variable price plan for which the Resident is eligible, unless the Resident chooses another price plan for which he or she is eligible. Resident acknowledges that Management may have a business relationship with the natural gas marketer that may provide for a financial or other benefit to Management in exchange for the Resident's enrollment with the Marketer.

11.   Fire and Other Casualty.   This lease will end if the apartment is uninhabitable due to fire as long as the fire was not caused by or the responsibility of Resident or Resident's occupants, family, or social guests. If Resident or his occupants, family, or social guests were responsible for the fire and the premises are uninhabitable, then Resident must vacate the apartment and will still remain liable for the rent and damages.

Management shall have the right to terminate the occupancy or lease of Resident if Resident or Resident's occupants, family, social guests, or invitees caused or were responsible for causing a fire to the apartment or any portion of the apartment community. Resident has no right to transfer to another apartment in the community or to remain in the apartment community if Resident or Resident's occupants, family, social guests, or invitees were responsible for or caused the fire. Resident may be eligible for transfer to another apartment in the apartment community if the Resident is qualified, there is a suitable apartment available, and Resident or Resident's occupants, family, social guests, and invitees did not cause the fire.

Resident is responsible for the cost of repair, replacement cost, and all expenses required to repair or replace the equipment, building, or property damaged by a fire which Resident or Resident's occupants, family, social guests, or invitees caused. Resident is liable to and shall indemnify, defend and hold harmless Management and the owner for any damages or repairs caused by a fire which was caused by Resident or Resident's occupants, family, social guests, and invitees.

This lease shall end if the premises are destroyed or otherwise rendered uninhabitable due to an Act of God or any other catastrophic event or casualty that was not the responsibility of Resident or Resident's occupants, family, social guests, or invitees.

The Resident shall not continue to occupy an apartment which is rendered uninhabitable due to fire, Act of God, or other catastrophic casualty and must remove all personal property and return possession to Management.

12.   Hold Over/Trespass.   Resident must promptly vacate the apartment and deliver possession and all keys to Management upon any termination or non-renewal of this lease. Keys must be physically handed to a representative of Management and may not be left in the apartment or in the overnight rent drop box at the Management office. The apartment must be delivered to Management in clean condition and good repair.

If Resident does not vacate the premises and return possession to Management after termination, non-renewal, or expiration of the lease, then Resident shall pay to Management rent at two (2) times the current rental rate for each day held over past the termination date.

After termination, non-renewal, or expiration of the lease, Resident is a tenant at sufferance.

After vacating the premises based on non-renewal, termination, eviction, or upon receiving a criminal trespass notice under O.C.G.A. § 16-7-21 from Management, Resident shall not return to any portion of the apartment community. Resident shall not permit entry of any person as his social guest or invitee if notified that his guest's or visitor's presence in the apartment community is subject to criminal trespass under O.C.G.A. § 16-7-21. Management may terminate the lease or right of possession of any Resident who allows an unauthorized person access to his apartment or the community in violation of this provision or paragraph 14. Management's rights under this paragraph shall continue and survive independently beyond expiration or termination of the lease or Resident's right of occupancy of the apartment.

13.   Right of Access.   Management may enter the apartment without notice during reasonable hours to inspect, maintain, and repair the premises. Management may enter the apartment at any time without notice to prevent injury or damage to persons or property. Resident authorizes Management to show the apartment to prospective Residents once Resident has given or received a notice of non-renewal or termination.

14.   Resident's Use of the Apartment and Conduct.   Resident shall use the apartment and apartment community only for residential purposes and not for business or commercial purposes.

Resident, all occupants, and Resident's family, social guests, and invitees must comply with all laws. No portion of the apartment or apartment community shall be used by Resident or Resident's occupants, family, social guests, or invitees for any disorderly, disruptive, abusive, or unlawful purpose, nor shall they be used so as to disrupt the quiet enjoyment of any other Resident or their occupants, family, and social guests. Resident and Resident's occupants, family, social guests, and invitees shall not commit any crime in the apartment community.

Resident is liable for the conduct of and for any damages exceeding normal wear and tear caused by his family, occupants, social guests, and invitees. Resident shall not allow his occupants, family, social guests, and invitees to commit a crime or violation of the lease and addenda and must take affirmative, corrective action and notify Management of any such violation or misconduct.

The sale, manufacture, distribution, or possession of any illegal drugs in the apartment community is prohibited.

Resident must maintain the apartment in a clean and sanitary condition and must not cause or allow any damages exceeding normal wear and tear or infestation of vermin, insects, rodents, or other pests. Noxious or offensive smells are not permitted, and Resident shall be liable for damages exceeding normal wear and tear for the repair or replacement of any carpet, flooring, ceiling, or walls that are permeated with noxious or offensive odors, water, or mold.   Resident shall not leave or dispose of trash, garbage, or other materials in hallways, breezeways, patios, balconies, or common areas of any portion of the apartment building or community.  Resident shall promptly take trash, garbage, or refuse to the proper dumpster, compactor, or trash collection area and properly dispose of organic and inorganic material as provided by law and as provided by the community rules.

Resident and Resident's occupants, family, social guests, and invitees shall abide by and follow all community rules and regulations.

Management shall have the right to prohibit smoking of cigarettes, pipes, cigars, or tobacco inside the apartment or any portion of the apartment community property under its community rules and regulations. Smoking of tobacco products in the apartment is prohibited unless expressly authorized and allowed by the community rules and regulations.

Copyright © 10/2015 - Atlanta Apartment Association, Inc. – Form # 1301
All Rights Reserved

011420160370404

Resident shall operate all motor vehicles in a [  ] and lawful manner in the apartment community. [  ]sident shall not violate any parking rules and regulations and shall not exceed 15 mph in any parking lot, street, exit, or entrance of the apartment community. Resident must park only in authorized spaces and places and shall not park at any place that obstructs traffic, is unsafe, or is prohibited. Resident shall not operate, park, or store, any illegal, unauthorized, or uninsured motor vehicle or equipment on any portion of the apartment community. Resident shall not abandon a motor vehicle in the apartment community.

Resident shall not store, keep, or dispose of any substance or material on any portion of the apartment community that is hazardous to the health, safety, or welfare of any person. Resident shall not dispose of any batteries, chemicals, environmentally hazardous, or unsafe material in any trash receptacle, dumpster, compactor, or any portion of the apartment community.

Resident, and Resident's occupants, family, social guests and invitees, shall act and communicate with the apartment owner, Management, Management employees, Residents, business social guests of Management, and all other persons in a lawful, courteous, and reasonable manner. Any form of verbally or physically abusive, intimidating, or aggressive behavior directed at the apartment owner, Management, Management employees, or any other person is prohibited. Resident, his social guests and occupants shall not interfere with the daily business operations of the apartment community or job duties of Management or its employees. When notified by Management, Resident shall be prohibited from entering or contacting any Management or corporate office or employee and must conduct all further communications in writing.

Resident shall not distribute petitions, flyers, or solicitation notices to other Residents in any manner other than through lawful use of the United States mail. Resident is prohibited from committing business libel or slander or making untruthful, unfair, or misleading statements to others about the apartment owner, Management, Management employees, or the apartment community.

Resident shall not commit waste to the apartment or apartment community and shall not commit any act nor fail to take any action that would endanger the life, health, safety, welfare or property of any other person in the apartment community. Resident must allow Management and vendors access to the apartment for the purpose of making repairs, performing service or maintenance, inspecting, and taking all other action related to the ongoing business operation of the apartment community.

Resident shall not cause or allow an infestation of bed bugs in the apartment. Resident shall not bring abandoned or discarded furniture, clothing, bedding, or other personal property into the apartment as it could introduce an infestation of pests and bed bugs.

Resident and Resident's occupants, family, social guests, and invitees shall not damage any portion of the apartment or apartment community. Resident and Resident's occupants, family, social guests, and invitees shall not touch, damage, or trigger any automatic sprinkler head.

Resident and occupants shall not use the internet or cyberspace in any manner to disparage, defame, or injure the business or business reputation of the apartment owner or Management. Resident and occupants shall not use, misuse, or appropriate the use of the owner's or Management's corporate names, logos, slogans, images, photos, internet domain names, service marks, trademarks, copyrights, or trade names. Resident and occupants shall not publish, misuse, or use any photos or video of Management employees or the apartment community or signage. Owner and Management shall be entitled to injunctive relief and damages for compensation to prevent any unauthorized publication, use or misuse, whether in part or in whole, of the corporate name, trade name, internet domain name, likeness or identity of owner or Management. Resident and occupants shall not make, post, or publish misleading, deceptive, untruthful, groundless, false, or unfair statements or commentary about the apartment community, the Management employees, the owner, or Management on or to any internet website or domain, internet blog, internet social media, newspaper, magazine, television, radio, or other news or social media. Resident is prohibited from making, publishing, stating, or posting any statement or communication that, while partially true, lacks or fails to disclose other material facts in such a way such as to mislead the listener, viewer, or reader. Management shall be entitled to terminate the right of occupancy or lease of any Resident or occupant who violates any portion of this Use and Conduct provision.

Resident and Resident's occupants, family, social guests, and invitees shall not store, use, or discharge any fireworks or consumer fireworks in the apartment or apartment community. Fireworks are defined as any combustible or explosive composition or any substance or combination of substances, or article prepared for the purpose of producing a visible or audible effect by combustion, explosion, deflagration, detonation, including but not limited to, blank cartridges, firecrackers, torpedoes, skyrockets, bombs, sparklers, roman candles and other combustibles and explosives of like construction.

Violation of this Resident's Use and Conduct provision is a material breach of this lease and constitutes a ground for terminating Resident's lease or right of possession, and Resident will be liable for any rent due through the remainder of the lease or liquidated damages (if applicable) as provided in Paragraph 26.

15. **Property Loss, Insurance, and Crime.** Management and the apartment owner shall not be liable for damage, theft, vandalism, or other loss of any kind to Resident's or his occupant's personal property, unless such is due to Management's negligence or intentional misconduct. Management and the apartment owner shall not be liable to Resident for crimes, injuries, loss, or damage due to criminal acts of other parties.

Resident must purchase a renter's insurance policy that provides liability insurance for negligent or accidental acts and omissions for which the Resident may be liable in causing injury or damage to the owner, Management, or others.

Resident should purchase property insurance for loss of or damage to Resident's own personal property. Management is not liable for any loss or damages to Resident's personal property due to theft, vandalism, bursting or leaking pipes, fire, windstorm, hail, flooding, rain, lightning, tornadoes, hurricanes, water leakage, snow, ice, running water, or overflow of water or sewage. Management shall not be liable for any injury or damage caused by such occurrences, and Resident agrees to look solely to his insurance carrier for reimbursement of his losses for such events.

Management does not market, advertise, represent, offer, or provide security or law enforcement services which will prevent crime or protect Resident or Resident's personal property. Management and the owner do not represent or guarantee that the Resident is safe from crime in the neighborhood or from crime in the apartment or apartment community. Resident agrees to look solely to public law enforcement, emergency services, or fire services for police, emergency, fire , security, or protection services.

Resident acknowledges that he or she has an obligation to exercise due care for his or her own safety and welfare at all times and that Management is not liable to Resident for the criminal acts of other persons. Resident agrees that he or she will not and cannot rely on the existence or absence of security equipment or personnel as a representation of safety from crime and understands that he or she must be vigilant and exercise caution for their personal safety at all times. Resident waives and releases the apartment owner and Management for any liability, injury, loss, or damages related to crimes committed by other persons against Resident or related to allegations that the owner or Management were negligent or failed to provide security or protection to prevent crime.

16. **Lead Based Paint Notification  (LBPN).** If this apartment community was built prior to 1978, the LBPN addendum is incorporated by reference.

17. **Flood Disclosure.** Management states that the apartment has not been damaged in any manner by flooding as defined in O.C.G.A. § 44-7-20 in 3 of the last 5 years unless noted otherwise in Par. 17.

18. **Pets.** No animals or pets of any kind are permitted without a Pet, Service, or Assistive Animal Addendum. Management may enter the apartment at any time and remove any pet or animal which Management believes to be neglected, distressed, or endangered. Resident shall be liable for all costs of retrieving, caring for, and boarding of any pet or animal that is abandoned by Resident or removed by Management. Resident releases Management from

Copyright © 10/2015 - Atlanta Apartment Association, Inc. - Form # 1301
All Rights Reserved

011420160370405

liability of any kind when Management acts to ... eve or protect Resident's pets and animals which ... ar to be neglected, distressed, or endangered. Please see Par. 9 with respect to Management's policy on service, assistive and convenience animals for person with disabilities.

19.  Indemnification.  Resident agrees to indemnify, defend, and hold harmless the apartment owner and Management for any loss the apartment owner or Management incur due to Resident's breach of this agreement or due to the acts and omissions of Resident and Resident's occupants, family, social guests, or invitees.

20.  Failure to Act.  Management has the right to insist on strict compliance with the terms of this lease at any time, even if it has previously delayed acting on Resident's breach of this lease.  Management shall have sole discretion in granting and withholding permission or consent for Resident to perform his or her obligations under this lease in any manner that varies from the contractual requirements.  Management at its option may condition, modify, or revoke any such permission or consent upon reasonable written notice and insist upon strict compliance with the lease terms.

21.  Fees and Expenses of Litigation.  In a civil action or dispossessory proceeding for breach of this lease, the prevailing party shall be entitled to attorney's fees in the amount of fifteen percent (15%) of the principal and interest owing and all expenses of litigation, including, but not limited to, court costs and administrative filing fees for evictions.  All sums due from Resident to Management which are in default shall bear interest at the rate of twelve percent (12%) per annum.

22.  Notices.  All notices must be written, dated, and signed.  The notice must be given personally or by certified mail, return receipt requested.  Notice shall be sent to Resident at the apartment and to Management at the apartment community business office.  See Par. 9 with regard to the proper address for service of lawsuits.

Resident shall send notices for repairs, service, maintenance, non-renewal, military transfers, and lease termination to the Management/leasing office located at the apartment community.

Resident shall provide Management with Resident's updated contact and address information and forwarding address at anytime requested during the lease and at the time of vacating the apartment.  Resident shall provide Management with: the address of his or her new residence (where they are living); the mailing address for returning any security deposit or forwarding any notices or move-out inspection and estimate of damages and cleaning fees that exceed normal wear and tear; the name, address, and phone number of their employer; the name, address, and phone number of a person or family member who can provide updated contact information; the Resident's cell phone and e-mails.  If Resident fails to provide his or her contact information and address at the time of vacating; conceals or attempts to conceal his or her address and location; moves from the State of Georgia; or cannot be located by Management, then the statute of limitation for collecting any account or money owed by Resident shall be tolled until such time as Resident provides proper notification of his address and other contact information requested.

RESIDENT'S NOTICE OF NON-RENEWAL UNDER PARAGRAPH 6 OR NOTICE OF INTENT TO VACATE AND TERMINATE THE LEASE EARLY UNDER PARAGRAPH 7 MUST BE IN WRITING AND MUST BE GIVEN SO THAT THE ENDING DATE IS ON THE LAST DAY OF A CALENDAR MONTH.  VERBAL NOTICES ARE NOT EFFECTIVE AND MAY NOT BE RELIED UPON BY RESIDENT UNDER ANY CIRCUMSTANCES.  MILITARY SERVICE MEMBERS MAY GIVE A NOTICE TO TERMINATE AS PROVIDED IN PAR. 7 AT ANY TIME OF THE MONTH.  NO MANAGEMENT EMPLOYEE IS AUTHORIZED TO VERBALLY OR UNILATERALLY WAIVE ANY NOTICE REQUIREMENT, AND RESIDENT MAY NOT RELY ON A VERBAL STATEMENT OF MANAGEMENT THAT PROPER WRITTEN NOTICE IS NOT NECESSARY.  MANAGEMENT MAY, BUT IS NOT REQUIRED TO, WAIVE THE REQUIREMENT THAT NOTICES BE EFFECTIVE ONLY AS OF THE END OF A CALENDAR MONTH.

23.  Repairs.  Resident accepts the apartment "as is" and in habitable condition suited for residential purposes.  Resident accepts full control and responsibility of the apartment leased premises and agrees to maintain the apartment in a clean, safe, and sanitary condition.  Management will make repairs to the apartment with reasonable promptness upon receipt of written notice from Resident.  Management's repair obligations under Georgia landlord/tenant law only pertain to the apartment, and not to the common areas of the apartment community.  Resident agrees and acknowledges that he or she only leased the apartment and that Resident's and Resident's occupants, family, and social guests access to amenities and common areas of the apartment community are only a permissive license to use such amenities and common areas.

Resident shall pay as additional rent for any cleaning or damages exceeding normal wear and tear to the premises caused by Resident or caused by Resident's occupants, family, social guests, invitees or licensees of the Resident and occupants that exceed normal wear and tear.  Resident and Resident's occupants, family, social guests, and invitees shall not damage any portion of the leased premises or apartment community, and Resident is responsible for the cost to repair, replacement cost, and all expenses required to repair or replace the equipment, building, or property damaged.  Resident is liable to and shall indemnify, defend, and hold harmless Management and the apartment owner for any damages or repairs caused by Resident or Resident's occupants, family, social guests, and invitees.  Resident shall promptly pay as additional rent with the next month's rent the costs of any repairs, replacement, or damages caused by Resident or Resident's occupants, family, social guests, or invitees upon issuance of an invoice from Management.

Resident may not alter the interior or exterior structure of the apartment or apartment community in any manner without the express written consent of Management.  Please see Par. 9 with regard to Management's policy on disability modification requests.

Resident must promptly report the need for any repairs to Management in writing before Management is obligated to make any repairs.  Resident must promptly report any dampness, water leaks, or mold in the apartment to Management.  Resident shall properly use the heating, ventilation, and air conditioning (HVAC) system to maintain temperate conditions so as to prevent freezing of water pipes in cold weather and to prevent mold growth or excessive humidity during warm weather.  Resident is required to use air conditioning during June, July, August, and September and shall not turn off the air conditioning and open windows for purposes of cooling the apartment.  Resident must inspect any fire alarm and fire extinguisher at least once per month to determine whether they are in proper working condition and report to Management the need for any need for repair or replacement.  Resident shall promptly notify Management of any damage to or malfunction of any door or window locks or intrusion alarm.

Resident must promptly report any evidence, knowledge, or suspected presence of bed bugs in the apartment and cooperate with Management to allow inspection and treatment of the same.  Adjoining or neighboring Residents to an apartment infested with bed bugs must cooperate with Management in inspection and treatment to prevent a possible cross infestation or migration.

24.  Abandonment.  Resident shall not abandon the apartment, Resident's personal property, or motor vehicles.  Title to any abandoned property (including, but not limited to, pets or animals) shall vest in Management.  Management may store, sell, or dispose of abandoned property without notice.

If Resident abandons the apartment or his or her personal property contained therein, Management shall have the right to re-key, re-enter, and re-let the apartment without filing a dispossessory warrant or obtaining a writ of possession.  Management is not required to file a dispossessory proceeding in order to recover an abandoned apartment or to dispose of any abandoned property found in an abandoned apartment.  Management shall have sole discretion in determining whether the Resident has abandoned the apartment.  Circumstances indicative of an abandonment include, but are not limited to, Resident's unexplained absence or failure to occupy the apartment; the overall appearance and condition of the apartment; Resident's statement that he or she is moving or leaving the apartment community; failure to pay rent or utilities; discontinuance of utility service; failure to respond to Management's notices, communications, or eviction proceedings; or removal of a substantial amount of Resident's personal property.

25.  Attornment, Sale, Foreclosure, Renovation, and Former Employees.  Resident's rights, or, if applicable, his employment with Management, are subordinate to any deed to secure debt, sale, or contract for sale of the property.

Copyright © 10/2015 – Atlanta Apartment Association, Inc. – Form # 1301
All Rights Reserved

In the event the apartment community or any portion or building of the community is foreclosed, sold, placed under contract to be sold, or scheduled for substantial renovation, rehabilitation, or demolition, either Management or the new owner shall have the right to terminate the lease on 30 days' written notice. In the event that Management elects to terminate the occupancy or lease under this provision, then during the 30 day period immediately preceding either the termination date of Resident's occupancy or the termination of the lease, the Resident's rent shall be reduced by fifty percent (50%); however, if the Resident shall hold over beyond the termination date, then Resident shall owe the full rent due for said 30 day notice period plus hold over rent as provided in paragraph 12.

If Resident is an employee of Management and his or her employment is terminated, then this employee lease shall also terminate, any employee rental discounts shall end, and the employee agrees to vacate the premises if requested. If permitted to stay, the former employee shall pay the current market rate rent as specified by Management at the time employment is terminated.

26. Default by Resident. Resident's violation of this lease or any addenda constitutes a default. Violations constituting a default include, but are not limited to: unauthorized occupants; non-payment of rent; improper non-renewal or termination of the lease as required by paragraphs 6 or 7; abandonment of the apartment as prohibited in paragraph 24; providing false or misleading information in the rental application; failure to pay or continue utility service as required in paragraph 10; allowing unauthorized persons access in violation of paragraph 12; any unauthorized occupants or improper use or conduct in violation of paragraph 14; or causing damages or cleaning in excess of normal wear and tear.

Upon default, Management may terminate Resident's lease or right of possession by giving written notice and re-entering the apartment as provided by law. Notice to cure a default is not required but, if given, shall not waive Management's right to terminate or insist on strict compliance. Resident shall surrender possession of the premises to Management promptly on the effective date of any termination notice, remove all possessions and persons occupying the apartment, return all keys to Management by personally handing them to a Management representative, and restore Management to quiet possession of the leased premises.

Notwithstanding Management's termination due to Resident's default, Resident shall remain liable for all rent, hold-over rent under paragraph 12, liquidated damages (if applicable) as provided below, unpaid utilities, rental concession, lost discounts or pay-backs, damages exceeding normal wear and tear, costs of eviction, attorney's fees and expenses of re-letting incurred by Management as a result of Resident's default.

Management, at its option, may obtain possession of the apartment through a dispossessory proceeding, either with or without first terminating the lease or right of possession. Management, at its option, may also recover possession of an abandoned apartment without filing a dispossessory proceeding by changing the locks and disposing of any abandoned property.

Notwithstanding termination of the lease, commencement of a dispossessory proceeding, issuance of a writ of possession, actual physical eviction, or recovery of the abandoned premises, Resident shall remain liable for all rent accrued through the date on which possession is obtained by Management; rent through the remainder of the lease term or liquidated damages (if applicable) as provided in this paragraph; damages exceeding normal wear and tear; unpaid utilities; rental concession, lost discounts or pay-backs; costs fees, and expenses. Neither issuance of a writ of possession, actual physical eviction, or retaking possession of the apartment shall relieve Resident of liability for rent through the end of the lease term or liquidated damages (if applicable) under this paragraph. All rent, fees, damages and liquidated damages (if applicable) shall be due immediately upon demand for payment.

In the event of a default by Resident, the Resident shall be liable to Management for rent through the remainder of the lease term as follows. Management may either allow the apartment to remain vacant and hold Resident liable for payment of rent through the remaining term of the lease; sue the Resident for breach of the lease and for each installment of rent as it comes due through expiration of the lease; or re-enter the premises as provided by law and re-let the apartment on Resident's behalf while holding the Resident liable for any deficiency between the contract rent and rent received through the remaining term of the lease until the re-letting. Management has the right, but not the obligation, to attempt to re-let the premises on Resident's behalf.

In the event that Resident has breached or defaulted the lease and failed to terminate the lease properly as provided by law or as provided for in Paragraphs 6 or 7 of this Apartment Rental Contract, then Resident shall be liable to Management for unpaid rent due through the remainder of the lease term under this paragraph (Par. 26), and not as provided in Paragraph 7, and Management is not entitled to collect any termination (cancellation) fee or notice fee.

Liquidated Damages In Lieu of Rent Through the Remainder of the Lease Term. Management shall not be entitled to Liquidated damages unless the Liquidated Damages Addendum has been signed by Management and Resident to indicate that the parties desire to use liquidated damages in determining the amount of rent due through the remainder of the lease term in the event of Resident's default. In the event the parties have selected liquidated damages for determining Resident's liability due to Resident's breach, then the Liquidated Damages Addendum is incorporated herein by reference, and the parties shall execute the same as a separate addendum.

Management's re-entry to leased premises either under judicial process or by retaking possession after abandonment or surrender shall not relieve Resident of liability for payment of rent through the remainder of the lease term or liquidated damages (if applicable) that landlord is entitled to collect under the terms of this rental agreement.

Management shall have the right to terminate the lease or right of possession of any Resident or occupant of the apartment who is arrested, indicted, charged, or convicted of any felony, crime of violence, or threatened violence; robbery; theft; dishonesty; rape; child molestation; sexual offense; illegal sale, use, or possession of drugs; illegal use or possession of a weapon; stalking; arson; criminal damage to property; vandalism; issuance of bad checks; fraud; forgery; or any other crime which could adversely affect the health, safety, or welfare of other Residents or Management staff, regardless of whether the offense occurred on or off the apartment community premises and regardless of when the offense occurred. Management shall have the right to file a dispossessory action and obtain a writ of possession based on the Resident's or occupant's conduct which constitutes a criminal violation without waiting for a criminal adjudication, finding, or decision on the criminal charges.

Management shall have the right to terminate the lease of any Resident whose apartment is found to be infested with bed bugs; have a mold or water intrusion problem; be unfit for habitation; or constitute a hazard to health, safety, or welfare of any person, the apartment, the apartment community or management employees. Upon such termination, resident must promptly vacate, remove all personal property and possessions, and return possession of the apartment to Management.

27. Privacy, Disclosure, and Consent. Resident agrees that information about him or her that is known to Management or contained in his or her Resident file is not confidential, privileged or private. Resident authorizes Management to disclose any information known or contained in the Resident file to any law enforcement agencies who request such information either with or without a subpoena; to prospective landlords or lenders who request such information in connection with approval of any rental application or home purchase; or to persons or parties who make a request for such information using discovery procedures in a civil action or subpoena in a criminal proceeding.

Resident agrees that the apartment owner and Management shall have the right to provide information from its account and business records to any Consumer Reporting Agency to be included in the Resident's consumer file and credit history, including, but not limited to, rental history, rental payments, unpaid balances, and other information. If the Resident disputes the accuracy of the information provided, the Resident shall notify the Consumer Reporting Agency and send written notice of the dispute to Management at the address specified in Par. 9. When giving notice to Management of any dispute as to the accuracy of adverse rental information, rental payments, disputed account balance, or other disputed information. Resident agrees to

Copyright © 10/2015 - Atlanta Apartment Association, Inc. - Form # 1301
All Rights Reserved

011420160370407

provide his or her correct names on the lease, ____ apartment number, complete apartment address, d. ___ of occupancy, and clear details as to the basis of such dispute that the Consumer Reporting Agency and Management will have sufficient information to investigate, evaluate and respond to the dispute.

Resident agrees that Management shall have the right to pursue collection of any sums alleged due from Resident through employment of independent contractors as collectors and that such sums may be reported to any consumer reporting agency (credit bureau) and shown on Resident's credit report. Resident agrees that variances or inaccuracies in the amounts submitted for collection or reported to any credit bureaus do not constitute a violation of any federal or state laws pertaining to reporting or collection of such debts and that the amount alleged due may be amended or corrected at any time. Resident agrees that Management or any such collector or collection agency is expressly authorized to contact Resident by phone or mail to notify Resident of the debt or attempt collection of the same and to communicate with third parties regarding the existence of the debt, the location of the Resident, or the Resident's ability to pay the debt. Resident agrees that Management or any such collector is expressly authorized to obtain a consumer report (credit report) on Resident and to obtain information on Resident's location and employment in connection with the collection of any amounts claimed due under this lease. Management's and collector's rights under this paragraph shall continue and survive independently beyond expiration or termination of the lease or Resident's occupancy of the apartment.

Resident(s), their occupants, family members, and social guests herby authorize and grant Management, their contractor(s), employee(s), and or any third parties hired by Management, permission to take, use, and publish photographs and/or videos of Resident(s), their occupants and social guests, including but not limited to, their minor children, at events and/or activities in the common areas of the apartment community. Management is permitted to use such photographs or video for print, publication, copyright, online social media and video-based marketing materials, as well as any other form of publication or use at Management's sole discretion. Resident(s), their occupants and social guests, including their minor children, release and hold harmless Management from any reasonable expectation of privacy or confidentially associated with the images and videos taken and used by Management. Resident(s) and their occupants, family members, and social guests acknowledge and agree they will not receive any type of financial compensation, ownership or royalties with the taking, use, marketing, or publication of any photographs or videos.

28.   Definitions.   The term "Resident" includes all tenants or other persons who signed or are obligated under the lease. "His" shall also mean "her" when applicable. "Resident" refers to the tenant. The term "Management" may refer to the owner of the apartment community or to the managing agent who is under a Management contract to operate the apartment community on behalf of the owner. The legal ownership entity is different from the Management entity.   The owner's managing agent may or may not have any ownership interest in the apartment community and may be an entirely independent contractor which operates the apartment community for the owner for a fee. "Occupants" are persons who are living in the apartment rental with the Resident and disclosed in the lease but have not signed the lease. The term "occupants" means persons who did not sign the lease but were disclosed and authorized to live in the apartment on a full time basis. Occupants could include family members of the Resident, but is not limited to family members, and includes roommates or other persons who are authorized to live in the apartment as disclosed in this lease. "NSF" means checks that are dishonored or returned by the bank unpaid, and is also referred to as "not sufficient funds." "Skip" means to vacate or abandon the leased premises in violation of this lease, either with or without turning in all keys and either with or without removing all personal property. "Notice period" refers to the length of time required in paragraph 6 or 7 or any other provision before a notice can take effect. The word "lease" means the Apartment Rental Contract which creates the relationship of landlord and tenant between the Resident and Management. "Leased premises" refers to the apartment Resident rented, and is also referred to as the "premises" or "lease premises," but does not include any of the common areas or other portions of the apartment community property. The term "leased premises" does not include any portions of the apartment community outside of the apartment rental unit as the Resident only has a permissive license to use the other areas and amenities of the apartment community in conjunction with the rental of the apartment. "Termination date" is the date following a notice period or the date on which Resident's lease or right of possession terminates as specified either in a non-renewal notice or a lease termination notice from Management based on Resident's default. A "social guest" is any person who is present in the Resident's apartment or on the apartment community property by express or implied invitation of the Resident or Resident's occupants, other social guests, or family members and includes anyone temporarily living or visiting Resident. The term "social guest" includes, but is not limited to, visitors and family members visiting or present in the apartment or apartment community. An "invitee" refers to a business guest or visitor who is present in the apartment or the apartment community with the express or implied invitation of the Resident for the purpose of conducting or soliciting business with or for the Resident, occupants, or social guests of the Resident. The "trade name" is the name of the apartment community and is the name or alias under which the legal owner of record does business and operates the apartment community. A "default" or "breach" of the lease and addenda means a violation of the lease provisions and gives Management the right to terminate the Resident's occupancy or lease. "GREC" means the Georgia Real Estate Commission.

29.   Usufruct.   This lease only creates the relationship of landlord (Management) and tenant (Resident) and does not create any ownership or transferable rights in real estate. This lease is a "usufruct," and not an estate for years.

30.   Entire Agreement.   This lease, any referenced addenda, and any addenda separately signed or referring to the lease or apartment shall constitute the entire agreement between the parties, and no prior negotiations, representations, or oral statements are binding. This lease may not be modified except with the express written consent of Management. The Resident is legally obligated under the terms and conditions of any addenda which he or she signed, and the same are part of and incorporated by reference into this lease.

31.   Joint and Several Liability.   Each person, corporation, or roommate who signs this lease or any guarantor under a separate guarantor's agreement is jointly and severally liable for all rent or other charges which come due. Management may look to any Resident or guarantor for payment of all or a part of any obligation due without first suing or attempting to collect from any other responsible party. Management and the owner or any collection agency or attorney representing the owner or Management shall have the right to settle in whole or part all or a portion of any debt owed by one Resident without releasing or waiving its claim for the balance of the debt against another Resident, co-signor, or guarantor. Settlement or release of one Resident or Guarantor shall not release the other Resident or Guarantor from liability for the debt owed.

32.   Agency Disclosure.   Management is acting on behalf of the owner of the apartment community in exchange for compensation.

33.   Know Your Neighbors.   Certain individuals convicted of certain sex-related crimes are required to register their name and current address on an index maintained by the state or county in which they reside. You may access that index in order to determine whether any such individuals live in proximity to a certain location. The public may access the Internet to view all sex offenders registered in Georgia. The Statewide Sex Offender Register can be obtained through the Internet at http://gbi.georgia.gov/georgia-sex-offender-registry. The public may also contact the local Sheriff to view a list of the sex offenders listed in their county.

34.   Special Stipulations.   Any special stipulations specified in Par. 34 shall control and supersede and control over conflicting provisions in the text of this lease.

Copyright © 10/2015 - Atlanta Apartment Association, Inc. - Form # 1301
All Rights Reserved

011420160370408

 

**RENTAL CONCESSION ADDENDUM**

FORM VALID FOR
GEORGIA APARTMENT
ASSOCIATION
MEMBERS ONLY

Addendum Date: **January 14, 2016** , **Eighteen Capital Group**
["Management"] [ ] as Owner or [X] as Agent for the Owner of **SBV Atlanta-Concord Chase, LLC**
["Community Name"] enters into this Rental Concession Addendum to the Apartment Rental Contract ["the Lease"] with **Yadiry Pena-Jiminez**
pertaining to Apt. No. **#802** located at ▓▓▓▓▓▓ ["Resident"].
**January 15, 2016** [Date of the Lease]. ▓▓▓▓▓▓ This addendum is part of the Apartment Rental Contract dated

1. This Addendum is part of the above Apartment Rental Contract ["the Lease"] and provides an incentive to lease with specific conditions that require the Resident to stay in compliance with the terms and conditions of the lease as specified below.

   **IMPORTANT:** Resident can lose the rental concession for the month of a default or the remainder of the lease and may have to repay concessions taken prior to default as provided below. It is important that you read this addendum carefully.

2. The Resident is obligated to pay the contractual amount of rent stated in Par. 3 of the Lease.

   However, as an inducement to lease the apartment, Management will provide Resident with a Rental Concession under the following terms and conditions. The rental concession is a form of discounted rent that requires the Resident to pay rent timely and not default in his or her obligations in the Lease or this addendum.

3. In order to receive and be eligible for the Rental Concession, the Resident must be and remain in compliance and cannot be in default with the Lease or this addendum. Listed below are explanations of what can occur if the Resident defaults.

   a) **Temporary Breach of Rental Contract and Temporary Loss of Concession.** Resident shall lose the rental concession for any month in which the Resident fails to pay rent timely or otherwise defaults under any other terms and conditions of the lease.

   If Resident is not timely in payment of rent, utility, or other charges which come due, then the concession shall be lost for the month in which a default occurred.

   The concession can be reinstated for the remaining term of the lease at such time as Resident comes back into compliance with the lease, cures the default, and pays all rent, late fees, utilities, damages, or other charges that are due and delinquent.

   Upon Management's election to accept payment and reinstate the lease combined with Resident's payment in full of the past due rent and late fee, lost rental concession, or other applicable charges, the lease shall stand as reinstated, and Resident shall be eligible for the rental concession for the remainder of the lease, if applicable.

   b) **Permanent Breach of Rental Contract and Irrevocable Loss of Concession.** In the event the Resident abandons the apartment or vacates after the filing of a dispossessory proceeding (eviction) and fails to pay rent due; or in the event the Resident defaults and is physically evicted from the apartment and fails to pay rent due [check which apply]:

   ___ The remainder of the rental concession is irrevocably *lost going forward.*

   _X_ Resident must repay rental concessions previously taken in prior months, having a *retroactive effect of requiring repayment of concessions already received* as a credit against rent previously paid.

   If Resident abandons the apartment without properly terminating the Lease under the method provided for in Paragraph 7 (Early Termination) of the Apartment Rental Contract the concession shall be lost for the remainder of the rental payments due under the Lease.

4. The Resident's rental concession shall apply as a reduction in rent as provided below. The concession is a credit against the rental contract amount stated in Paragraph 3 of the Lease. It is a bookkeeping entry into the management software accounting system. A rental concession is not a security deposit and is non-refundable. It is not transferrable, nor is it assignable. The Resident is not entitled to receive cash or a cash equivalent in lieu of taking a credit against rent due. The rental concession is only applicable to the specific apartment and lease referred to above. The concession amount only applies if Management receives rent timely. The rental concession is only a credit against the full monthly rental amount stated in the Lease and cannot be used in any other manner.

   The total amount of the rental concession is $ **800.00** , to be taken as follows [check all that apply and fill in the appropriate blanks]:

   a) One month's rent for the month of _____

   b) $ **800.00** each month beginning **01/15/16** through **02/15/16**

   c) Other method of applying the rental concession:
   **Resident will receive $439.00 off January 2016 & $361.00 off February 2016 for a total $800.00 free.**

   This Addendum only applies during the initial term of the Lease unless specifically extended by agreement under any renewal or extension of the Lease. The rental concession provided for above shall not be applicable except as expressly stated above unless otherwise modified in writing and signed by both parties.

**01142016370409**

Copyright © August, 2012 by Atlanta Apartment Association, Inc. - Form #1208
All Rights Reserved

Page 1 of 2

5.  Resident's Election to Take Early Termination pursuant to Paragraph 7 of the Lease.

In the event the Resident elects to terminate the Lease prior to expiration of the Lease term stated in Par. 1 (Term) of the Lease (check the provision that is applicable):

_____ Resident is *NOT* required to repay the rental concessions taken prior to the effective date the lease will end;

OR

__X__ Resident must repay the rental concessions taken prior to the effective date the lease will end.

6.  In the event Resident's lease is terminated or Resident's right to occupancy of the apartment is terminated due to Resident's default, Resident shall lose the rental concession as provided in Paragraph 3 of this addendum.  For purposes of compelling payment of rent into court during the pendency of any dispossessory or for collection of rent due in a breach of contract civil action, the Resident shall owe the full monthly rental amount specified in Paragraph 3 of the Lease without any credit for a concession.  In the event Resident holds over rent beyond the term of the Lease and owes hold over rent, the amount of hold over rent shall be two times the amount of rent due under Paragraph 3 of the Lease without a credit for the concession.

7.  If any portion or provision of this addendum is declared to be invalid or unenforceable, then the remaining portions shall be severed and survive and remain enforceable.  The court shall interpret and construe the remaining portion of this addendum so as to carry out the intent and effect of the parties.  In the event of a conflict between the provisions of this addendum and the Lease, the Addendum shall control.  Except as modified by this addendum, the Lease shall remain in full force and effect.

Eighteen Capital Group
_____
Name of Owner or Management Company

By: _____
Signature of Owner or Management Company

As: _____ (Title)

Resident _____

Resident _____

Resident _____

Resident _____

011420160370410

Copyright © August, 2012 by Atlanta Apartment Association, Inc. - Form #1205
All Rights Reserved

Page 2 of 2

**GAA**
GEORGIA APARTMENT ASSOCIATION

Apartment Rental Contract

FORM VALID FOR
GEORGIA APARTMENT
ASSOCIATION
MEMBERS ONLY

This Apartment Rental Contract is a lease between the Owner of the Apartment Community and the Residents who are leasing the apartment.
The General Provisions of the lease which follow the signatures at the bottom of this page and any separate addenda signed by the parties are incorporated into and become part of this lease. Paragraph numbers on this page correspond to paragraph numbers in the General Provisions.

Lease Date: **January 16, 2017**
Management: **Eighteen Capital Group**
☐ Owner  ☒ Management Co. as Agent for Owner
Apartment Community Name: **SBV Atlanta-Concord Chase, LLC**
Apartment No.:
Apartment Address: ~~██████~~ Smyrna, GA 30082
Residents/Tenants: **Yadiry Pena-Jiminez**

Other Occupants of Apartment: ~~██████~~   ~~██████~~

Par. 1.   Lease Term:   **10**   Months and _____ Days
Beginning Date:   **01/14/2017**                    Ending Date: **11/13/2017**

Par. 3.   Rent Due Monthly   $ **820.00**
Pro Rated Rent Due at Lease Signing  $    **476.13**
Dates of Prorated Rent  **01/14/2017** to **01/31/2017**
Month to Month Fee  $
Rent is Payable to  **Concord Chase Apartments**                    (Name on Check or Money Order)

Par. 4.   Late Fees and Insufficient Funds Fees
Date on Which Rent is Late                      **5**
Amount of Late Fee           $ **100.00**      or _____ % of Rent
Per Day Late Fee             $ **10.00**       per day after   **5**   day of the month
Returned or Insufficient Check Fee  ☒ Service Fee of $ **35.00**   or ☐ 5% of Amount of Check  plus  ☐ Bank Service Fee of
[Amount charged by Bank to Management for Charge Back]

Par. 5.   Re-Key Lock Charge        $   **45.00**
Non-refundable Lease Fee     $  **125.00**
Security Deposit             $  **200.00**
Bank Name          ~~██████~~                    (Where Security Deposit Kept)

Par. 6.   How Much Notice Required To Non-Renew Lease Prior To End of Initial Lease Term   **60**   Days
Renewal Period          ☐ Month to Month (1 month at a time) Renewal  ☐ Bi-Monthly (2 months at a time) Renewal
Notice Required to End Renewal Period  ☒ 30 days to end Month to Month Renewal  ☐ 60 days to end Bi-Monthly Renewal

Par. 7.   Early Termination Option: Amount of Notice Required for Electing Early Termination   **60**   Days Written Notice

Par. 9.   Disclosure Notice of Owner or Managing Agent and Equal Housing Opportunity Policy
Name of Managing Agent for Owner   **SBV-ATLANTA CONCORD CHASE**
Address of Agent Authorized to   **300 Hurt Rd SE Smyrna, GA 30082**
Manage Apartment Community
Name of Owner or Registered Agent   **18 Capital Group**
Authorized to Receive Notices and
Lawsuits
Address of Owner or Registered Agent
Authorized to Receive Notices and
Lawsuits
Corporate Name of GREC Licensee   **18 Capital Group**
GREC Corporate License No.

Par. 17.  Flood Disclosure  ☒ Not Applicable   ☐ Apartment has been flooded previously

Par. 34.  Special Stipulations: **Resident will pay $820.00 rent, plus $55.00 of water, plus $4.00 of trash, $2.00 pest control, and $10.00 of hot water fee for a total of $891.00**

Signatures of Parties:
Management
**Eighteen Capital Group**
Name of Management

By: _____
Signature of Management Representative Name

As: _**Property Mgr**_     (Job Title)

Residents

Printed Name of Resident: **Yadiry Peña-Jiminez**     (Resident Signature)

Printed Name of Resident: _____     (Resident Signature)

Printed Name of Resident: _____     (Resident Signature)

Printed Name of Resident: _____     (Resident Signature)

Copyright © 10/2016 - Atlanta Apartment Association, Inc. - Form # 1301
All Rights Reserved
GENERAL PROVISIONS FOLLOW                    Page 1 of 8

**General Lease Provisions.**

The Owner is the landlord of the property, and the Resident is the tenant. The apartment community is managed for the Owner by its Managing Agent.

The lease is legally effective on the date it is signed, regardless of whether it was signed before or after the Resident moves into the apartment. There is no conditional three day right to rescind or void the contract once it is signed, and the Resident is legally bound to pay all rent, fees, and other charges that come due, regardless of whether the Resident continues to occupy the apartment. The Lease Date is the day on which the lease was signed and became effective as a contract.

The lease is a legally binding contract that creates the relationship of landlord and tenant for the full duration of the lease term at the rental rate stated above. Any addenda signed by the Owner and Resident are also part of this Apartment Rental Contract.

The Owner provides the apartment to the Resident in exchange for payment of monthly rent. The Resident's obligation to pay rent is independent of any other obligation of Landlord in the lease.

Listed above are important terms, conditions, and payment amounts. They are listed at the beginning of the lease to provide the parties with an easy reference. Each of the first page terms correspond to important lease provisions that follow below. Paragraph references on the first page correspond to the paragraph number of the General lease provisions that follow.

**Important Information About Ending The Lease and Management's Right to Increase the Rent During Any Extension Period.** This lease does not end automatically at the end of the initial lease term. The Resident must give a proper non-renewal notice to end the lease as provided in Par. 6. The lease will be extended or renewed for an additional period of time stated in Par. 6. The lease continues to renew until the proper non-renewal notice is given. If the lease is renewed or extended, the Resident will be responsible for paying an additional Month-to-Month Fee and may also pay a higher rent than the rent specified in Par. 3, if Management gives notice of the higher rent amount.

The apartment shall only be occupied by Residents and the occupants listed on page 1, and any other occupants not listed above are unauthorized to live in the apartment.

1.     **Term.** The initial lease term of the lease is for the number of months and days specified in Par. 1. The initial term of the lease begins and ends at noon on the days specified in Par. 1 but will be automatically renewed on either a month to month or bi-monthly basis as stated in Par. 6. RESIDENT MAY NOT TERMINATE THIS LEASE PRIOR TO THE END OF THE INITIAL TERM EXCEPT IN STRICT COMPLIANCE WITH PARAGRAPH 7 or as otherwise provided by law.

2.     **Possession.** Rent shall abate until possession is granted to Resident. Resident may void or rescind this lease if possession is not granted within seven (7) days from the start of the lease term. Management is not liable for any delay in possession. Resident shall give Management written notice of his or her election to void or rescind the contract.

3.     **Rent.** Resident shall pay rent in advance on the 1st day of each month at the management office as provided in Par. 3. The first month's prorated rent shall be due at the time this lease is signed as provided in Par. 3. If this lease is extended or renewed under Paragraph 6 without signing a new lease, Resident shall owe a month-to-month fee in addition to the monthly rent due during any extension or renewal period.

CASH PAYMENTS WILL NOT BE ACCEPTED, AND NO MANAGEMENT EMPLOYEE IS AUTHORIZED TO ACCEPT A CASH PAYMENT UNDER ANY CIRCUMSTANCES. RESIDENT MAY NOT RELY ON ANY STATEMENT MADE TO HIM BY A MANAGEMENT RESPRESENTATIVE THAT CASH WILL BE ACCEPTED.

All rent shall be paid by personal check, cashier's check, or money order. Management shall have the right to establish or provide for payment by credit card, debit card, electronic funds transfer, online payment portal, or designated online payment system and software, but Resident does not have the right to make payments by these means unless specifically authorized by Management. Management shall have the right to designate the specific manner or form of payment that will be accepted, and no other form of payment shall be acceptable than those specified by Management. Checks and money orders shall be made payable to the order of the business entity specified in Par. 3. Third party checks (those which are made payable to someone other than Management) and partial payments are not allowed. All other damages, utilities, fees, or charges owed by Resident and due under this lease are considered to be additional rent.

The amount of rent specified in Par. 3 is the amount due each month unless Management has given the Resident a rental concession or discount from the rent, either in the Special Stipulations to this lease or in a separate addendum. If there are rental concessions granted, the Resident will or may lose them if in default or breach of this lease and will be obligated to pay the full amount of rent specified in Par. 3. If in default or breach of the lease, the Resident may have to repay the rental concessions under certain specified conditions.

4.     **Late Payments and Checks with Insufficient Funds.** Time is of the essence. After close of business on the last day of the grace period specified in Par. 4, late fees shall be due in the amount specified.

Resident shall pay Management an insufficient funds check service fee for each returned or NSF check, plus an additional fee equal to the fee charged to Management by the bank. If no box is checked in Par. 4 that specifies the amount of the service fee, then the insufficient funds service fee is five per cent (5%) of the face amount of the check, plus the fee charged by the bank. At Management's option, all late rent, NSF checks, and future rents due after an NSF check must be paid by money order or certified funds from a bank. The parties agree that bank service, NSF, and late fees are reasonable compensation for delay, administrative costs, and time in collecting past due rent, are not penalties, and that such costs are difficult to estimate accurately.

5.     **Lease Fees & Security Deposit.** Resident must pay the amounts specified in Par. 5 for re-keying locks, any non-refundable lease fees, or security deposits. A re-keying lock fee is due for each lock that must be re-keyed if all keys are not returned. The non-refundable lease fee is not a security deposit, is not refundable, and does not reduce Resident's liability for unpaid rent, damages exceeding normal wear and tear, or other charges that come due under the lease. Any security deposit will be refunded as provided by law but may be applied to any charges due under this lease. The deposit will either be protected by a surety bond on file with the Clerk of Superior Court or deposited in the bank specified in Par. 5. Interest earned on such deposits belongs to Management.

Management shall have the right to apply any security deposit held to money or a debt owed by the Resident to Management. Management is not restricted to or limited in how the security deposit is applied if money is owed, and the deposit may applied to rent, damages exceeding normal wear and tear, unpaid utilities, or any other fee, charge, or debt owed by Resident. Management may apply a pet or animal deposit to unpaid rent or damages exceeding normal wear and tear that were not caused by a pet or animal.

Resident shall have no right to use or designate a security deposit as payment of rent or other fees and charges which are due, as provided by O.C.G.A. 44-7-33(b). Resident agrees to cooperate with Management in scheduling and performing Move-In and Move-Out inspections and noting any existing damages or objecting to Management's list of damages exceeding normal wear and tear.

6.     **Renewal Term and Notice of Non-Renewal to End the Lease.** Either party may non-renew and terminate this lease at the end of the initial term by giving a written non-renewal notice prior to the end of the initial lease term. If such non-renewal notice is not given, then this lease will be extended as provided in Par. 6 on a either a Month-to-Month basis (one month at a time) until either party gives a proper 30 day notice; or on a Bi-Monthly basis (two

Copyright © 10/2015 - Atlanta Apartment Association, Inc. - Form # 1301
All Rights Reserved

months at a time) until either party gives a proper 60 day notice in writing that terminates the lease. Unless otherwise allowed by Landlord, the lease shall terminate at the end of a calendar month.

Management shall have the right to increase the rent due in any extension or renewal term by giving written notice at least 15 days prior to the date on which a non-renewal notice must be given in order to end the initial term or any subsequent renewal or extension period.

If not specified in Par. 6, then a 30 day written notice is required to end the initial term or any renewal or extension period as of the end of a calendar month.

Management employees are not authorized to accept a verbal notice of non-renewal or termination from the Resident, and the Resident has no right to rely on a Management employee's statement that a verbal notice is acceptable. Resident's non-renewal or termination notice must be in writing, dated, signed, and specify the move-out date. Resident should confirm Management's receipt of the notice with the authorized signature of a Management representative using Management's notice of intent to vacate form. Resident should keep a signed receipt of the non-renewal notice for his personal records in case of any dispute as to whether such notice was given and received. If Resident does not obtain a signed receipt of such notice from Management, or if Management does not have a signed original non-renewal notice from Resident, then it will be presumed that Resident failed to give a proper written notice.

7.   Resident's Early Termination Option.  Resident can end all liability for rent under this lease (but not liability for damages exceeding normal wear and tear, or liability for unpaid utilities) and vacate before the end of the initial lease term stated in Par. 7 only by doing all of the following things required in this paragraph. If all of the following conditions are not performed, then the lease remains in effect for the full term, and Resident shall be liable for breach of the rental agreement as provided in Paragraph 26. If Resident skips, abandons, or is evicted from the apartment without complying with this paragraph, then Resident is in default and responsible for rent and liquidated damages (if applicable) as provided under Paragraph 26, any other fees or charges due, and all damages and cleaning fees in excess of normal wear and tear. Management employees are not authorized to make a verbal statement that waives the notice and termination fees, and the Resident has no right to rely on a Management employee's statement that Resident will not have to pay such fees or comply with this provision in order to terminate the lease early. Any waiver of the notice or fees required under this provision must be in writing, dated, and signed by all parties. Resident's election to use or not use this provision is purely voluntary.

To end the lease early, Resident MUST do EACH of the following: 1) pay all monies currently due; 2) give written notice in the amount specified in Par. 7 of intent to vacate prior to the first day of the month and to take effect as of the last day of a calendar month; 3) pay all rent due through the notice period preceding the early termination date; 4) pay an additional early termination or lease cancellation fee equal to one month's rent as liquidated damages; vacate the leased premises on or before the specified termination date, remove all occupants and possessions, and physically hand the keys to a Management representative; and 5) abandon, waive, and release a claim to the return of any security deposit, which shall become Management's.

If the length of the Early Termination notice is not specified in Par. 7 on the first page, then a 30 day written notice is required. Resident can move-out earlier than the termination date following the notice period in Par. 7, but Resident must turn in all keys, remove all occupants and personal property, pay all rent due through the required non-renewal notice period, pay the one-month termination or lease cancellation fee, and comply with all other requirements. Keys must be physically handed to a representative of Management and may not be left in the apartment or a night rent drop-box.

If Resident elects to exercise his or her right to Early Termination, Resident is not entitled to a refund of any rent, notice or termination fees, or security deposit, even if the apartment is re-let to a new Resident prior to the end of the notice period. Resident's election to exercise this early termination option either by giving proper notice and paying all sums due or by giving proper notice and signing an agreement to terminate early and pay the sums due at a later date are binding and shall not be reduced or set-off by any money or rent Management receives from re-letting the apartment to a new or subsequent Resident.

Military Transfers and Lease Terminations.  A Resident (including a Resident's spouse) who is a service member on active duty or is called to active duty in the regular or reserve component of the U.S. Armed Forces, U.S. Coast Guard, or National Guard, shall have the right to end this Apartment Rental Contract early by giving a 30 day written notice, paying all rent due through the notice date, and providing a copy of the official military orders or written verification signed by the service member's commanding officer or by providing base housing orders as provided in O.C.G.A. Section 44-7-22, if the service member is:

1.   Ordered to federal duty for a period of 90 days or longer;
2.   Receives a permanent change of station orders to move at least 35 miles away from the rental housing;
3.   Is released from active duty after leasing housing and must move 35 miles or more away from the service member's home of record prior to entering active duty;
4.   After entering into this rental agreement, the service member becomes eligible to live in government quarters or the failure to move to government quarters will result in a forfeiture of the service member's basic allowance for housing;
5.   Receives temporary duty orders or temporary change of station orders or state active duty orders for a period exceeding 80 days that is at least 35 miles away from the location of the rental housing; or
6.   Receives orders after signing the lease but before taking possession of the rental housing.

8.   No Assignment/Subletting.   Resident may not sublet or assign the lease.

9.   Disclosure Notice of Owner or Managing Agent and Equal Housing Opportunity Policy.

The name and address of company or party authorized to manage the apartment community for the owner is specified in Par. 9. The name and address of the owner or owner's registered agent who is authorized to receive notices and lawsuits against the Landlord is specified in Par. 9. Lawsuits filed against the owner or Management shall be filed and served as provided by law or as contractually agreed to by Resident.

The Corporate Broker's Name of the Licensed Managing Agent and Broker's license number as required by the rules of the Georgia Real Estate Commission (Ga.R. & Reg. 520-1-.10) is specified in Par. 9.

Equal Housing Opportunity Policy.  The apartment owner and Management provide equal housing opportunity for qualified applicants and do not discriminate on the basis of race, color, religion, sex, national origin, familial status, disability, or any other legally recognized status in the State of Georgia. It is the owner's and Management's policy to provide reasonable accommodations in the apartment community's operational policies and procedures and to permit the Resident to make reasonable modifications that are necessary for the Resident and related to the disability for persons with a demonstrated disability. The Resident must request and obtain permission from the owner or management for any accommodation or modification prior to implementing the same. In general, the cost or expense of physical modifications to the apartment or apartment community is the responsibility of the Resident, unless the applicable law requires the owner or Management to absorb or be responsible for the cost of such modifications. A Resident or occupant with a demonstrated disability is allowed to have an assistance animal to assist with the person's disability. A disabled Resident or occupant is allowed to have an assistance animal which has not been trained as a service animal unless the animal has a history of dangerous, vicious, or unsafe behavior. If the nature of the disability is not obvious or apparent or the manner in which the animal will provide assistance is not clear, Management has the right to request additional information regarding how the animal will assist with the resident's disability. The Resident does not have an absolute right to the specific accommodation or modification requested, and Management has the right to offer an substitute or alternate accommodation or modification with conditions that will provide adequate assurance for the safety, health, and well being of other Residents, occupants, social guests, invitees, and

Copyright © 10/2015 - Atlanta Apartment Association, Inc. - Form # 1301
All Rights Reserved

Management employees. No Additional Rent, Non-refundable Fee, or Animal Security Deposit is required from Residents or occupants who are disabled and have an approved service or assistance animal; however, the Resident is responsible for any and all damages and cleaning fees exceeding normal wear and tear caused by such animal.

10. **Utilities Are Resident's Responsibility.** Resident is responsible for payment of all natural gas, electricity, water and sewer, telephone, cable, satellite or other utilities and services to the apartment unless specified otherwise in Paragraph 34 or in a utility addendum which is made a part of this lease. Resident gives Management the right to select any utility provider and change the same without notice. Resident shall promptly establish all utility and service accounts to be paid by Resident in his name at the start of the lease and shall not allow water and sewer, electricity, or natural gas to be shut off or billed to Management. Resident shall promptly pay any billing for utilities or other services charged to Management upon notification. Resident's failure to pay all utility services or to establish an account with a utility provider is a material breach of the lease for which Management has the right to terminate the right of occupancy or lease.

** Important Disclosure Regarding Management's Right to Select the Natural Gas Marketer (Provider). Resident (the Tenant) authorizes Management (the Landlord) to act as Resident's agent for the limited purpose of selecting the Resident's natural gas marketer, to authorize the natural gas marketer to obtain credit information on the Resident, if required by the marketer, and to enroll the Resident on the marketer's standard variable price plan for which the Resident is eligible, unless the Resident chooses another price plan for which he or she is eligible. Resident acknowledges that Management may have a business relationship with the natural gas marketer that may provide for a financial or other benefit to Management in exchange for the Resident's enrollment with the Marketer.

11. **Fire and Other Casualty.** This lease will end if the apartment is uninhabitable due to fire as long as the fire was not caused by or the responsibility of Resident or Resident's occupants, family, or social guests. If Resident or his occupants, family, or social guests were responsible for the fire and the premises are uninhabitable, then Resident must vacate the apartment and will still remain liable for the rent and damages.

Management shall have the right to terminate the occupancy or lease of Resident if Resident or Resident's occupants, family, social guests, or invitees caused or were responsible for causing a fire to the apartment or any portion of the apartment community. Resident has no right to transfer to another apartment in the community or to remain in the apartment community if Resident or Resident's occupants, family, social guests, or invitees were responsible for or caused the fire. Resident may be eligible for transfer to another apartment in the apartment community if the Resident is qualified, there is a suitable apartment available, and Resident or Resident's occupants, family, social guests, and invitees did not cause the fire.

Resident is responsible for the cost of repair, replacement cost, and all expenses required to repair or replace the equipment, building, or property damaged by a fire which Resident or Resident's occupants, family, social guests, or invitees caused. Resident is liable to and shall indemnify, defend and hold harmless Management and the owner for any damages or repairs caused by a fire which was caused by Resident or Resident's occupants, family, social guests, and invitees.

This lease shall end if the premises are destroyed or otherwise rendered uninhabitable due to an Act of God or any other catastrophic event or casualty that was not the responsibility of Resident or Resident's occupants, family, social guests, or invitees.

The Resident shall not continue to occupy an apartment which is rendered uninhabitable due to fire, Act of God, or other catastrophic casualty and must remove all personal property and return possession to Management.

12. **Hold Over/Trespass.** Resident must promptly vacate the apartment and deliver possession and all keys to Management upon any termination or non-renewal of this lease. Keys must be physically handed to a representative of Management and may not be left in the apartment or in the overnight rent drop box at the Management office. The apartment must be delivered to Management in clean condition and good repair.

If Resident does not vacate the premises and return possession to Management after termination, non-renewal, or expiration of the lease, then Resident shall pay to Management rent at two (2) times the current rental rate for each day held over past the termination date.

After termination, non-renewal, or expiration of the lease, Resident is a tenant at sufference.

After vacating the premises based on non-renewal, termination, eviction, or upon receiving a criminal trespass notice under O.C.G.A. § 16-7-21 from Management, Resident shall not return to any portion of the apartment community. Resident shall not permit entry of any person as his social guest or invitee if notified that his guest's or visitor's presence in the apartment community is subject to criminal trespass under O.C.G.A. § 16-7-21. Management may terminate the lease or right of possession of any Resident who allows an unauthorized person access to his apartment or the community in violation of this provision or paragraph 14. Management's rights under this paragraph shall continue and survive independently beyond expiration or termination of the lease or Resident's right of occupancy of the apartment.

13. **Right of Access.** Management may enter the apartment without notice during reasonable hours to inspect, maintain, and repair the premises. Management may enter the apartment at any time without notice to prevent injury or damage to persons or property. Resident authorizes Management to show the apartment to prospective Residents once Resident has given or received a notice of non-renewal or termination.

14. **Resident's Use of the Apartment and Conduct.** Resident shall use the apartment and apartment community only for residential purposes and not for business or commercial purposes.

Resident, all occupants, and Resident's family, social guests, and invitees must comply with all laws. No portion of the apartment or apartment community shall be used by Resident or Resident's occupants, family, social guests, or invitees for any disorderly, disruptive, abusive, or unlawful purpose, nor shall they be used so as to disrupt the quiet enjoyment of any other Resident or their occupants, family, and social guests. Resident and Resident's occupants, family, social guests, and invitees shall not commit any crime in the apartment community.

Resident is liable for the conduct of and for any damages exceeding normal wear and tear caused by his family, occupants, social guests, and invitees. Resident shall not allow his occupants, family, social guests, and invitees to commit a crime or violation of the lease and addenda and must take affirmative, corrective action and notify Management of any such violation or misconduct.

The sale, manufacture, distribution, or possession of any illegal drugs in the apartment community is prohibited.

Resident must maintain the apartment in a clean and sanitary condition and must not cause or allow any damages exceeding normal wear and tear or infestation of vermin, insects, rodents, or other pests. Noxious or offensive smells are not permitted, and Resident shall be liable for damages exceeding normal wear and tear for the repair or replacement of any carpet, flooring, ceiling, or walls that are permeated with noxious or offensive odors, water, or mold. Resident shall not leave or dispose of trash, garbage, or other materials in hallways, breezeways, patios, balconies, or common areas of any portion of the apartment building or community. Resident shall promptly take trash, garbage, or refuse to the proper dumpster, compactor, or trash collection area and properly dispose of organic and inorganic material as provided by law and as provided by the community rules.

Resident and Resident's occupants, family, social guests, and invitees shall abide by and follow all community rules and regulations.

Management shall have the right to prohibit smoking of cigarettes, pipes, cigars, or tobacco inside the apartment or any portion of the apartment community property under its community rules and regulations. Smoking of tobacco products in the apartment is prohibited unless expressly authorized and allowed by the community rules and regulations.

Copyright © 10/2015 - Atlanta Apartment Association, Inc. - Form # 1301
All Rights Reserved

YPJ

Resident shall operate all motor vehicles in a safe and lawful manner in the apartment community. Resident shall not violate any parking rules and regulations and shall not exceed 15 mph in any parking lot, street, exit, or entrance of the apartment community. Resident must park only in authorized spaces and places and shall not park at any place that obstructs traffic, is unsafe, or is prohibited. Resident shall not operate, park, or store, any illegal, unauthorized, or uninsured motor vehicle or equipment on any portion of the apartment community. Resident shall not abandon a motor vehicle in the apartment community.

Resident shall not store, keep, or dispose of any substance or material on any portion of the apartment community that is hazardous to the health, safety, or welfare of any person. Resident shall not dispose of any batteries, chemicals, environmentally hazardous, or unsafe material in any trash receptacle, dumpster, compactor, or any portion of the apartment community.

Resident, and Resident's occupants, family, social guests and invitees, shall act and communicate with the apartment owner, Management, Management employees, Residents, business social guests of Management, and all other persons in a lawful, courteous, and reasonable manner. Any form of verbally or physically abusive, intimidating, or aggressive behavior directed at the apartment owner, Management, Management employees, or any other person is prohibited. Resident, his social guests and occupants shall not interfere with the daily business operations of the apartment community or job duties of Management or its employees. When notified by Management, Resident shall be prohibited from entering or contacting any Management or corporate office or employees and must conduct all further communications in writing.

Resident shall not distribute petitions, flyers, or solicitation notices to other Residents in any manner other than through lawful use of the United States mail. Resident is prohibited from committing business libel or slander or making untruthful, unfair, or misleading statements to others about the apartment owner, Management, Management employees, or the apartment community.

Resident shall not commit waste to the apartment or apartment community and shall not commit any act nor fail to take any action that would endanger the life, health, safety, welfare or property of any other person in the apartment community. Resident must allow Management and vendors access to the apartment for the purpose of making repairs, performing service or maintenance, inspecting, and taking all other action related to the ongoing business operation of the apartment community.

Resident shall not cause or allow an infestation of bed bugs in the apartment. Resident shall not bring abandoned or discarded furniture, clothing, bedding, or other personal property into the apartment as it could introduce an infestation of pests and bed bugs.

Resident and Resident's occupants, family, social guests, and invitees shall not damage any portion of the apartment or apartment community. Resident and Resident's occupants, family, social guests, and invitees shall not touch, damage, or trigger any automatic sprinkler head.

Resident and occupants shall not use the Internet or cyberspace in any manner to disparage, defame, or injure the business or business reputation of the apartment owner or Management. Resident and occupants shall not use, misuse, or appropriate the use of the owner's or Management's corporate names, logos, slogans, images, photos, Internet domain names, service marks, trademarks, copyrights, or trade names. Resident and occupants shall not publish, misuse, or use any photos or video of Management employees or the apartment community or signage. Owner and Management shall be entitled to injunctive relief and damages for compensation to prevent any unauthorized publication, use or misuse, whether in part or in whole, of the corporate name, trade name, Internet domain name, likeness or identity of owner or Management. Resident and occupants shall not make, post, or publish misleading, deceptive, untruthful, groundless, false, or unfair statements or commentary about the apartment community, the Management employees, the owner, or Management on or to any Internet website or domain, Internet blog, Internet social media, newspaper, magazine, television, radio, or other news or social media. Resident is prohibited from making, publishing, stating, or posting any statement or communication that, while partially true, lacks or fails to disclose other material facts in such a way such as to mislead the listener, viewer, or reader. Management shall be entitled to terminate the right of occupancy or lease of any Resident or occupant who violates any portion of this Use and Conduct provision.

Resident and Resident's occupants, family, social guests, and invitees shall not store, use, or discharge any fireworks or consumer fireworks in the apartment or apartment community. Fireworks are defined as any combustible or explosive composition or any substance or combination of substances or article prepared for the purpose of producing a visible or audible effect by combustion, explosion, deflagration, detonation, including but not limited to, blank cartridges, firecrackers, torpedoes, skyrockets, bombs, sparklers, roman candles and other combustibles and explosives of like construction.

Violation of this Resident's Use and Conduct provision is a material breach of this lease and constitutes a ground for terminating Resident's lease or right of possession, and Resident will be liable for any rent due through the remainder of the lease or liquidated damages (if applicable) as provided in Paragraph 26.

15.   Property Loss, Insurance, and Crime.  Management and the apartment owner shall not be liable for damage, theft, vandalism, or other loss of any kind to Resident's or his occupant's personal property, unless such is due to Management's negligence or intentional misconduct. Management and the apartment owner shall not be liable to Resident for crimes, injuries, loss, or damage due to criminal acts of other parties.

Resident must purchase a renter's insurance policy that provides liability insurance for negligent or accidental acts and omissions for which the Resident may be liable in causing injury or damage to the owner, Management, or others.

Resident should purchase property insurance for loss of or damage to Resident's own personal property. Management is not liable for any loss or damages to Resident's personal property due to theft, vandalism, bursting or leaking pipes, fire, windstorm, hail, flooding, rain, lightening, tornadoes, hurricanes, water leakage, snow, ice, running water, or overflow of water or sewage. Management shall not be liable for any injury or damage caused by such occurrences; and Resident agrees to look solely to his insurance carrier for reimbursement of his losses for such events.

Management does not market, advertise, represent, offer, or provide security or law enforcement services which will prevent crime or protect Resident or Resident's personal property. Management and the owner do not represent or guarantee that the Resident is safe from crime in the neighborhood or from crime in the apartment or apartment community. Resident agrees to look solely to public law enforcement, emergency services, or fire services for police, emergency, fire , security, or protection services.

Resident acknowledges that he or she has an obligation to exercise due care for his or her own safety and welfare at all times and that Management is not liable to Resident for the criminal acts of other persons. Resident agrees that he or she will not and cannot rely on the existence or absence of security equipment or personnel as a representation of safety from crime and understands that he or she must be vigilant and exercise caution for his personal safety at all times. Resident waives and releases the apartment owner and Management for any liability, injury, loss, or damages related to crimes committed by other persons against Resident or related to allegations that the owner or Management were negligent or failed to provide security or protection to prevent crime.

16.   Lead Based Paint Notification  (LBPN).  If this apartment community was built prior to 1978, the LBPN addendum is incorporated by reference.

17.   Flood Disclosure.  Management states that the apartment has not been damaged in any manner by flooding as defined in O.C.G.A. § 44-7-20 in 3 of the last 5 years unless noted otherwise in Par. 17.

18.   Pets.  No animals or pets of any kind are permitted without a Pet, Service, or Assistive Animal Addendum. Management may enter the apartment at any time and remove any pet or animal which Management believes to be neglected, distressed, or endangered. Resident shall be liable for all costs of retrieving, caring for, and boarding of any pet or animal that is abandoned by Resident or removed by Management. Resident releases Management from

Copyright © 10/2015 - Atlanta Apartment Association, Inc. – Form # 1301
All Rights Reserved

Page 5 of 8

liability of any kind when Management acts to retrieve or protect Resident's pets and animals which appear to be neglected, distressed, or endangered. Please see Par. 9 with respect to Management's policy on service, assistive and convenience animals for person with disabilities.

19.   Indemnification.   Resident agrees to indemnify, defend, and hold harmless the apartment owner and Management for any loss the apartment owner or Management incur due to Resident's breach of this agreement or due to the acts and omissions of Resident and Resident's occupants, family, social guests, or invitees.

20.   Failure to Act. Management has the right to insist on strict compliance with the terms of this lease at any time, even if it has previously delayed acting on Resident's breach of this lease.  Management shall have sole discretion in granting and withholding permission or consent for Resident to perform his or her obligations under this lease in any manner that varies from the contractual requirements.  Management at its option may condition, modify, or revoke any such permission or consent upon reasonable written notice and insist upon strict compliance with the lease terms.

21.   Fees and Expenses of Litigation.   In a civil action or dispossessory proceeding for breach of this lease, the prevailing party shall be entitled to attorney's fees in the amount of fifteen percent (15%) of the principal and interest owing and all expenses of litigation, including, but not limited to, court costs and administrative filing fees for evictions. All sums due from Resident to Managment which are in default shall bear interest at the rate of twelve percent (12%) per annum.

22.   Notices.  All notices must be written, dated, and signed.  The notice must be given personally or by certified mail, return receipt requested.  Notice shall be sent to Resident at the apartment and to Management at the apartment community business office.  See Par. 9 with regard to the proper address for service of lawsuits.

Resident shall send notices for repairs, service, maintenance, non-renewal, military transfers, and lease termination to the Management/leasing office located at the apartment community.

Resident shall provide Management with Resident's updated contact and address information and forwarding address at anytime requested during the lease and at the time of vacating the apartment. Resident shall provide Management with: the address of his or her new residence (where they are living); the mailing address for returning any security deposit or forwarding any notices or move-out inspection and estimate of damages and cleaning fees that exceed normal wear and tear; the name, address, and phone number of their employer; the name, address, and phone number of a person or family member who can provide updated contact information; the Resident's cell phone and e-mails. If Resident fails to provide his or her contact information and address at the time of vacating; conceals or attempts to conceal his or her address and location; moves from the State of Georgia; or cannot be located by Management; then the statute of limitation for collecting any account or money owed by Resident shall be tolled until such time as Resident provides proper notification of his address and other contact information requested.

RESIDENT'S NOTICE OF NON-RENEWAL UNDER PARAGRAPH 6 OR NOTICE OF INTENT TO VACATE AND TERMINATE THE LEASE EARLY UNDER PARAGRAPH 7 MUST BE IN WRITING AND MUST BE GIVEN SO THAT THE ENDING DATE IS ON THE LAST DAY OF A CALENDAR MONTH.  VERBAL NOTICES ARE NOT EFFECTIVE AND MAY NOT BE RELIED UPON BY RESIDENT UNDER ANY CIRCUMSTANCES.  MILITARY SERVICE MEMBERS MAY GIVE A NOTICE TO TERMINATE AS PROVIDED IN PAR. 7 AT ANY TIME OF THE MONTH.  NO MANAGEMENT EMPLOYEE IS AUTHORIZED TO VERBALLY OR UNILATERALLY WAIVE ANY NOTICE REQUIREMENT.  AND RESIDENT MAY NOT RELY ON A VERBAL STATEMENT OF MANAGEMENT THAT PROPER WRITTEN NOTICE IS NOT NECESSARY.  MANAGEMENT MAY, BUT IS NOT REQUIRED TO, WAIVE THE REQUIREMENT THAT NOTICES BE EFFECTIVE ONLY AS OF THE END OF A CALENDAR MONTH.

23.   Repairs.   Resident accepts the apartment "as is" and in habitable condition suited for residential purposes. Resident accepts full control and responsibility of the apartment leased premises and agrees to maintain the apartment in a clean, safe, and sanitary condition.  Management will make repairs to the apartment with reasonable promptness upon receipt of written notice from Resident.  Management's repair obligations under Georgia landlord/tenant law only pertain to the apartment, and not to the common areas of the apartment community. Resident agrees and acknowledges that he or she only leased the apartment and that Resident's and Resident's occupants, family, and social guests access to amenities and common areas of the apartment community are only a permissive license to use such amenities and common areas.

Resident shall pay as additional rent for any cleaning or damages exceeding normal wear and tear to the premises caused by Resident or caused by Resident's occupants, family, social guests, invitees or licensees of the Resident and occupants that exceed normal wear and tear.  Resident and Resident's occupants, family, social guests, and invitees shall not damage any portion of the leased premises or apartment community, and Resident is responsible for the cost to repair, replacement cost, and all expenses required to repair or replace the equipment, building, or property damaged.  Resident is liable to and shall indemnify, defend, and hold harmless Management and the apartment owner for any damages or repairs caused by Resident or Resident's occupants, family, social guests, and invitees. Resident shall promptly pay as additional rent with the next month's rent the costs of any repairs, replacement, or damages caused by Resident or Resident's occupants, family, social guests, or invitees upon issuance of an invoice from Management.

Resident may not alter the interior or exterior structure of the apartment or apartment community in any manner without the express written consent of Management. Please see Par. 9 with regard to Management's policy on disability modification requests.

Resident must promptly report the need for any repairs to Management in writing before Management is obligated to make any repairs. Resident must promptly report any dampness, water leaks, or mold in the apartment to Management.  Resident shall properly use the heating, ventilation, and air conditioning (HVAC) system to maintain temperate conditions so as to prevent freezing of water pipes in cold weather and to prevent mold growth or excessive humidity during warm weather.  Resident is required to use air conditioning during June, July, August, and September and shall not turn off the air conditioning and open windows for purposes of cooling the apartment.  Resident must inspect any fire alarm and fire extinguisher at least once per month to determine whether they are in proper working condition and report to Management the need for any need for repair or replacement.  Resident shall promptly notify Management of any damage to or malfunction of any door or window locks or intrusion alarm.

Resident must promptly report any evidence, knowledge, or suspected presence of bed bugs in the apartment and cooperate with Management to allow inspection and treatment of the same.  Adjoining or neighboring Residents to an apartment infested with bed bugs must cooperate with Management in inspection and treatment to prevent a possible cross infestation or migration.

24.   Abandonment.   Resident shall not abandon the apartment, Resident's personal property, or motor vehicles.  Title to any abandoned property (including, but not limited to, pets or animals) shall vest in Management. Management may store, sell, or dispose of abandoned property without notice.

If Resident abandons the apartment or his or her personal property contained therein, Management shall have the right to re-key, re-enter, and re-let the apartment without filing a dispossessory warrant or obtaining a writ of possession. Management is not required to file a dispossessory proceeding in order to recover an abandoned apartment or to dispose of any abandoned property found in an abandoned apartment.  Management shall have sole discretion in determining whether the Resident has abandoned the apartment.  Circumstances indicative of an abandonment include, but are not limited to, Resident's unexplained absence or failure to occupy the apartment; the overall appearance and condition of the apartment; Resident's statement that he or she is moving or leaving the apartment community; failure to pay rent or utilities; discontinuance of utility service; failure to respond to Management's notices, communications, or eviction proceedings; or removal of a substantial amount of Resident's personal property.

25.   Attornment; Sale; Foreclosure; Renovation; and Former Employees; Resident's rights, or, if applicable, his employment with Management; are subordinate to any deed to secure debt, or contract for sale of the property.

Copyright © 10/2015 – Atlanta Apartment Association, Inc. – Form # 1801
All Rights Reserved

In the event the apartment community or any portion or building of the community is foreclosed, sold, placed under contract to be sold, or scheduled for substantial renovation, rehabilitation, or demolition, either Management or the new owner shall have the right to terminate the lease on 30 days' written notice. In the event that Management elects to terminate the occupancy or lease under this provision, then during the 30 day period immediately preceding either the termination date of Resident's occupancy or the termination of the lease, the Resident's rent shall be reduced by fifty percent (50%); however, if the Resident shall hold over beyond the termination date, then Resident shall owe the full rent due for said 30 day notice period plus hold over rent as provided in paragraph 12.

If Resident is an employee of Management and his or her employment is terminated, then this employee lease shall also terminate, any employee rental discounts shall end, and the employee agrees to vacate the premises if requested. If permitted to stay, the former employee shall pay the current market rate rent as specified by Management at the time employment is terminated.

26. Default by Resident. Resident's violation of this lease or any addenda constitutes a default. Violations constituting a default include, but are not limited to: unauthorized occupants; non-payment of rent; improper non-renewal or termination of the lease as required by paragraphs 6 or 7; abandonment of the apartment as prohibited in paragraph 24; providing false or misleading information in the rental application; failure to pay or continue utility service as required in paragraph 10; allowing unauthorized persons access in violation of paragraph 12; any unauthorized occupants or improper use or conduct in violation of paragraph 14; or causing damages or cleaning in excess of normal wear and tear.

Upon default, Management may terminate Resident's lease or right of possession by giving written notice and re-entering the apartment as provided by law. Notice to cure a default is not required but, if given, shall not waive Management's right to terminate or insist on strict compliance. Resident shall surrender possession of the premises to Management promptly on the effective date of any termination notice, remove all possessions and persons occupying the apartment, return all keys to Management by personally handing them to a Management representative, and restore Management to quiet possession of the leased premises.

Notwithstanding Management's termination due to Resident's default, Resident shall remain liable for all rent, hold-over rent under paragraph 12, liquidated damages (if applicable) as provided below, unpaid utilities, rental concession, lost discounts or pay-backs, damages exceeding normal wear and tear, costs of eviction, attorney's fees and expenses of re-letting incurred by Management as a result of Resident's default.

Management, at its option, may obtain possession of the apartment through a dispossessory proceeding, either with or without first terminating the lease or right of possession. Management, at its option, may also recover possession of an abandoned apartment without filing a dispossessory proceeding by changing the locks and disposing of any abandoned property.

Notwithstanding termination of the lease, commencement of a dispossessory proceeding, issuance of a writ of possession, actual physical eviction, or recovery of the abandoned premises, Resident shall remain liable for all rent accrued through the date on which possession is obtained by Management; rent through the remainder of the lease term or liquidated damages (if applicable) as provided in this paragraph; damages exceeding normal wear and tear; unpaid utilities; rental concession, lost discounts or pay-backs; costs fees, and expenses. Neither issuance of a writ of possession, actual physical eviction, or retaking possession of the apartment shall relieve Resident of liability for rent through the end of the lease term or liquidated damages (if applicable) under this paragraph. All rent, fees, damages and liquidated damages (if applicable) shall be due immediately upon demand for payment.

In the event of a default by Resident, the Resident shall be liable to Management for rent through the remainder of the lease term as follows. Management may either allow the apartment to remain vacant and hold Resident liable for payment of rent through the remaining term of the lease; sue the Resident for breach of the lease and for each installment of rent as it comes due through expiration of the lease; or re-enter the premises as provided by law and re-let the apartment on Resident's behalf while holding the Resident liable for any deficiency between the contract rent and rent received through the remaining term of the lease until the re-letting. Management has the right, but not the obligation, to attempt to re-let the premises on Resident's behalf.

In the event that Resident has breached or defaulted the lease and failed to terminate the lease properly as provided by law or as provided for in Paragraphs 6 or 7 of this Apartment Rental Contract, then Resident shall be liable to Management for unpaid rent due through the remainder of the lease term under this paragraph (Par. 26), and not as provided in Paragraph 7, and Management is not entitled to collect any termination (cancellation) fee or notice fee.

Liquidated Damages In Lieu of Rent Through the Remainder of the Lease Term. Management shall not be entitled to liquidated damages unless the Liquidated Damages Addendum has been signed by Management and Resident to indicate that the parties desire to use liquidated damages in determining the amount of rent due through the remainder of the lease term in the event of Resident's default. In the event the parties have selected liquidated damages for determining Resident's liability due to Resident's breach, then the Liquidated Damages Addendum is incorporated herein by reference, and the parties shall execute the same as a separate addendum.

Management's re-entry to leased premises either under judicial process or by retaking possession after abandonment or surrender shall not relieve Resident of liability for payment of rent through the remainder of the lease term or liquidated damages (if applicable) that landlord is entitled to collect under the terms of this rental agreement.

Management shall have the right to terminate the lease or right of possession of any Resident or occupant of the apartment who is arrested, indicted, charged, or convicted of any felony, crime of violence, or threatened violence; robbery; theft; dishonesty; rape; child molestation; sexual offense; illegal sale, use, or possession of drugs; illegal use or possession of a weapon; stalking; arson; criminal damage to property; vandalism; issuance of bad checks; fraud; forgery; or any other crime which could adversely affect the health, safety, or welfare of other Residents or Management staff, regardless of whether the offense occurred on or off the apartment community premises and regardless of when the offense occurred. Management shall have the right to file a dispossessory action and obtain a writ of possession based on the Resident's or occupant's conduct which constitutes a criminal violation without waiting for a criminal adjudication, finding, or decision on the criminal charges.

Management shall have the right to terminate the lease of any Resident whose apartment is found to be infested with bed bugs; have a mold or water intrusion problem; be unfit for habitation; or constitute a hazard to health, safety, or welfare of any person; the apartment, the apartment community, or management employees. Upon such termination, resident must promptly vacate, remove all personal property and possessions, and return possession of the apartment to Management.

27. Privacy, Disclosure, and Consent. Resident agrees that information about him or her that is known to Management or contained in his or her Resident file is not confidential, privileged or private. Resident authorizes Management to disclose any information known or contained in the Resident file to any law enforcement agencies who request such information either with or without a subpoena; to prospective landlords or lenders who request such information in connection with approval of any rental application or home purchase; or to persons or parties who make a request for such information using discovery procedures in a civil action or subpoena in a criminal proceeding.

Resident agrees that the apartment owner and Management shall have the right to provide information from its account and business records to any Consumer Reporting Agency to be included in the Resident's consumer file and credit history, including, but not limited to, rental history, rental payments, unpaid balances, and other information. If the Resident disputes the accuracy of the information provided, the Resident shall notify the Consumer Reporting Agency and send written notice of the dispute to Management at the address specified in Par. 9. When giving notice to Management of any dispute as to the accuracy of adverse rental information, rental payments, disputed account balance, or other disputed information, Resident agrees to

Copyright © 10/2015 - Atlanta Apartment Association, Inc. - Form # 1301
All Rights Reserved

provide his or her correct names on the lease, the apartment number, complete apartment address, dates of occupancy, and clear details as to the basis of such dispute that the Consumer Reporting Agency and Management will have sufficient information to investigate, evaluate and respond to the dispute.

Resident agrees that Management shall have the right to pursue collection of any sums alleged due from Resident through employment of independent contractors as collectors and that such sums may be reported to any consumer reporting agency (credit bureau) and shown on Resident's credit report. Resident agrees that variances or inaccuracies in the amounts submitted for collection or reported to any credit bureaus do not constitute a violation of any federal or state laws pertaining to reporting, or collection of such debts and that the amount alleged due may be amended or corrected at any time. Resident agrees that Management or any such collector or collection agency is expressly authorized to contact Resident by phone or mail to notify Resident of the debt or attempt collection of the same and to communicate with third parties regarding the existence of the debt, the location of the Resident, or the Resident's ability to pay the debt. Resident agrees that Management or any such collector is expressly authorized to obtain a consumer report (credit report) on Resident and to obtain information on Resident's location and employment in connection with the collection of any amounts claimed due under this lease. Management's and collector's rights under this paragraph shall continue and survive independently beyond expiration or termination of the lease or Resident's occupancy of the apartment.

Resident(s), their occupants, family members, and social guests herby authorize and grant Management, their contractor(s), employee(s), and or any third parties hired by Management, permission to take, use, and publish photographs and/or videos of Resident(s), their occupants and social guests, including but not limited to, their minor children, at events and/or activities in the common areas of the apartment community. Management is permitted to use such photographs or video for print, publication, copyright, online social media and video-based marketing materials, as well as any other form of publication or use at Management's sole discretion. Resident(s), their occupants and social guests, including their minor children, release and hold harmless Management from any reasonable expectation of privacy or confidentiality associated with the images and videos taken and used by Management. Resident(s) and their occupants, family members, and social guests acknowledge and agree they will not receive any type of financial compensation, ownership or royalties with the taking, use, marketing, or publication of any photographs or videos.

28.   Definitions.   The term "Resident" includes all tenants or other persons who signed or are obligated under the lease. "His" shall also mean "her" when applicable. "Resident" refers to the tenant. The term "Management" may refer to the owner of the apartment community or to the managing agent who is under a Management contract to operate the apartment community on behalf of the owner. The legal ownership entity is different from the Management entity. The owner's managing agent may or may not have any ownership interest in the apartment community and may be an entirely independent contractor which operates the apartment community for the owner for a fee. "Occupants" are persons who are living in the apartment rental with the Resident and disclosed in the lease but have not signed the lease. The term "occupants" means persons who did not sign the lease but were disclosed and authorized to live in the apartment on a full time basis. Occupants could include family members of the Resident, but is not limited to family members, and includes roommates or other persons who are authorized to live in the apartment as disclosed in this lease. "NSF" means checks that are dishonored or returned by the bank unpaid, and is also referred to as "not sufficient funds." "Skip" means to vacate or abandon the leased premises in violation of this lease, either with or without turning in all keys and either with or without removing all personal property. "Notice period" refers to the length of time required in paragraph 6 or 7 or any other provision before a notice can take effect. The word "lease" means the Apartment Rental Contract which creates the relationship of landlord and tenant between the Resident and Management. "Leased premises" refers to the apartment Resident rented, and is also referred to as the "premises" or "lease premises," but does not include any of the common areas or other portions of the apartment community property. The term "leased premises" does not include any portions of the apartment community outside of the apartment rental unit as the Resident only has a permissive license to use the other areas and amenities of the apartment community in conjunction with the rental of the apartment. "Termination date" is the date following a notice period or the date on which Resident's lease or right of possession terminates as specified either in a non-renewal notice or a lease termination notice from Management based on Resident's default. A "social guest" is any person who is present in the Resident's apartment or on the apartment community property by express or implied invitation of the Resident or Resident's occupants, other social guests, or family members and includes anyone temporarily living or visiting Resident. The term "social guest" includes, but is not limited to, visitors and family members visiting or present in the apartment community. An "invitee" refers to a business guest or visitor who is present in the apartment or the apartment community with the express or implied invitation of the Resident for the purpose of conducting or soliciting business with or for the Resident, occupants, or social guests of the Resident. The "trade name" is the name of the apartment community and is the name or alias under which the legal owner of record does business and operates the apartment community. A "default" or "breach" of the lease and addenda means a violation of the lease provisions and gives Management the right to terminate the Resident's occupancy or lease. "GREC" means the Georgia Real Estate Commission.

29.   Usufruct.   This lease only creates the relationship of landlord (Management) and tenant (Resident) and does not create any ownership or transferable rights in real estate. This lease is a "usufruct," and not an estate for years.

30.   Entire Agreement.   This lease, any referenced addenda, and any addenda separately signed or referring to the lease or apartment shall constitute the entire agreement between the parties, and no prior negotiations, representations, or oral statements are binding. This lease may not be modified except with the express written consent of Management. The Resident is legally obligated under the terms and conditions of any addenda which he or she signed, and the same are part of and incorporated by reference into this lease.

31.   Joint and Several Liability.   Each person, corporation, or roommate who signs this lease or any guarantor under a separate guarantor's agreement is jointly and severally liable for all rent or other charges which come due. Management may look to any Resident or guarantor for payment of all or a part attorney representing the owner or Management shall have the right to settle in whole or part all or a portion of any debt owed by one Resident without releasing or waiving its claim for the balance of the debt against another Resident; co-signor, or guarantor. Settlement or release of one Resident or Guarantor shall not release the other Resident or Guarantor from liability for the debt owed.

32.   Agency Disclosure.   Management is acting on behalf of the owner of the apartment community in exchange for compensation.

33.   Know Your Neighbors.   Certain individuals convicted of certain sex-related crimes are required to register their name and current address on an index maintained by the state or county in which they reside. You may access that index in order to determine whether any such individuals live in proximity to a certain location. The public may access the internet to view all sex offenders registered in Georgia. The Statewide Sex Offender Register can be obtained through the internet at http://gbi.georgia.gov/georgia-sex-offender-registry. The public may also contact the local Sheriff to view a list of the sex offenders listed in their county.

34.   Special Stipulations.   Any special stipulations specified in Par. 34 shall control and supersede and control over conflicting provisions in the text of this lease.

Copyright © 10/2015 – Atlanta Apartment Association, Inc. - Form # 1301
All Rights Reserved



FORM VALID FOR
GEORGIA APARTMENT
ASSOCIATION
MEMBERS ONLY

## LEAD-BASED PAINT/HAZARD DISCLOSURE FORM

For Use on Properties Contracted Prior to 1978
With Attached EPA Publication  Protect Your Family From Lead In Your Home
Management's, Lessor's, or Owner's Copy

Instructions and Disclosure Form to Applicants and Existing Residents on Month to Month or Renewal Leases

Effective September 6, 1996, owners and management are required to give disclosure warnings and provide  EPA/HUD approved information concerning the presence of lead paint in houses and apartments which were built before 1978.

Under federal law you are required to notify applicants, BEFORE they enter into a residential lease, of the possibility that the apartment community may contain lead-based paint if the housing was built prior to 1978.  Additionally, if the owner or management has actual knowledge of the presence of lead-based paint ("LBP") or lead-based paint  hazards ("LBPH"), you must also provide the applicant or renewal tenant with his or her own copy of any record or reports  which indicate the absence or presence and location of LBP or LBPH in the apartment community.  You may use a summary of the records or reports if they are lengthy.  The disclosure statement should be dated and signed by both  management and all applicants or renewal residents.

Also, you must give the same notification and information to any existing residents at the time of renewal, even if  they are on automatic month to month renewals.

To use this form, please complete and sign pages 1 and 2, and do all of the following:
1.  Check one of the two spaces under 2(a).  If management has knowledge about the presence or absence of  LBP or LBPH, place an "x" beside 2(a)(i) and describe what is known about presence or absence of LBP or LBPH  on the line provided.
2.  Check one of the two spaces under 2(b).  If management has documents or environmental test results about the presence or absence of LBP or LBPH, place an "x" beside 2(b)(i) and describe the name, date, and  information contained in the documents or environmental test reports.
3.  If you have records or reports available or reasonably accessible which indicate the presence of LBP or  LBPH; give a copy or a summary of the documents or environmental test results to the applicant.
4.  List which records or reports are being provided in the blank space after 2(b)(i) if records or reports are available.
5.  Detach page 1 of the addendum and keep page 1 on file for three (3) years as a permanent record. Federal  law requires retention for a period of three (3) years.  Keep a copy in the resident file and another copy in a  permanent file that contains all LBP/LBPH disclosure forms.
6.  Give the applicant or renewal resident page 2 of the form and the EPA brochure called "Protect Your Family  From Lead in Your Home" for his or her records.  If there are two or more applicants or renewal residents have  each person sign.
7.  Provide this notice and any relevant records to the applicant or to the renewal resident prior to signing  the residential rental contract.  Federal law requires that the lead warning statement, disclosure, and  EPA/HUD information about LBP and LBPH be given to applicant or renewal prior to the time that the lease or rental  contract is signed.
8.  Be sure to keep a copy of any documents or environmental testing regarding the presence or absence of LBP  or LBPH in a permanent file at the management or leasing office on the property.  Make duplicate copies of all  LBP/LBPH disclosure forms in a separate file.  Make the file, documents, or environmental testing  reports available to any applicant, renewal resident, or authorized EPA official who requests to inspect the  LBP/LBPH records.

Copyright © 2013 by Atlanta Apartment Association, Inc. - Form # 9560
All Rights Reserved



MANAGEMENT'S, LESSOR'S, OR OWNER'S COPY
Place page 1 in Resident File as a Permanent Record and Part of the Apartment Rental Contract

# GAA
GEORGIA APARTMENT ASSOCIATION

**MOVE-IN AND MOVE-OUT INSPECTION CONTRACT – # 9421**

FORM VALID FOR GEORGIA APARTMENT ASSOCIATION MEMBERS ONLY

Apartment Community  **SBV Atlanta-Concord Chase, LLC**
Management  **Eighteen Capital Group**
Resident's Name  **Yadiry Pena-Jiminez**
Address of Apt.  ████████████████████████████████████  Apt. Number  **#901**

Important Notice to Resident of Resident's Rights and Duties Pursuant to O.C.G.A. 44-7-33 for Signing, Refusing to Sign, or Disputing the Accuracy of the Move In and Move Out Inspections. By law Management is required to give the Resident this written notice of Resident's rights and duties with respect to signing or disputing the accuracy of the Move In and Move Out inspections prepared by Management.

If Resident signs the lists prepared by Management without disputing their accuracy, then the accuracy of the lists shall be conclusive of the damages and conditions noted below.

If the Resident refuses to sign the lists as prepared by Management or if the Resident disagrees with or disputes the accuracy of the lists, the Resident must do one of two things: Resident must either
1) note on this form the items with which he or she disagrees; or
2) Resident may refuse to sign Management's list by promptly preparing and delivering to Management the Resident's own signed, written statement which specifically states the items on Management's lists with which the Resident disagrees, dissents, or disputes.

Important: If the Resident refuses to sign the lists or refuses to provide Management his or her own signed, written list of the specific items with which he or she disagrees, disputes, or dissents, then the Resident is not entitled to recover the security deposit or obtain any of the damages to which he or she would otherwise be entitled under O.C.G.A. 44-7-35 in the event Management does not properly account for or return the security deposit.

Both Management and Resident agree they inspected the apartment prior to move-in and did not observe any evidence of bed bugs, a bed bug infestation, mold, water intrusion, pests and rodents.

| LOCATION OF DAMAGE | MOVE-IN INSPECTION<br>Resident accepts responsibility for condition of the apartment "as is" with the exceptions listed below. This form is made a part of the Apartment Rental Contract and existing damages are noted below. | MOVE-OUT INSPECTION<br>Inspection to determine extent and estimated charges for any damages, cleaning, repainting, re-carpeting, and other charges exceeding normal wear and tear. Rent, utilities, and other charges may be itemized or billed separately. |
|---|---|---|
| LIVING<br>DINING | ☐ OK    ☐ NOT OK (see below)<br>WALLS _____<br>CEILING _____<br>CARPET _____<br>BLINDS _____<br>FIREPLACE _____<br>OTHER _____ | ☐ OK    ☐ NOT OK (see below)<br>WALLS _____ $____<br>CEILING _____ $____<br>CARPET _____ $____<br>BLINDS _____ $____<br>FIREPLACE _____ $____<br>OTHER _____ $____ |
| KITCHEN | ☐ OK    ☐ NOT OK (see below)<br>WALLS _____<br>CEILING _____<br>FLOORING _____<br>LIGHTS _____<br>APPLIANCES _____<br>COUNTER _____<br>OTHER _____ | ☐ OK    ☐ NOT OK (see below)<br>WALLS _____ $____<br>CEILING _____ $____<br>FLOORING _____ $____<br>LIGHTS _____ $____<br>APPLIANCES _____ $____<br>COUNTER _____ $____<br>OTHER _____ $____ |
| HALL | ☐ OK    ☐ NOT OK (see below)<br>WALLS _____<br>CEILING _____<br>CARPET _____<br>OTHER _____ | ☐ OK    ☐ NOT OK (see below)<br>WALLS _____ $____<br>CEILING _____ $____<br>CARPET _____ $____<br>OTHER _____ $____ |
| BEDROOMS | ☐ OK    ☐ NOT OK (see below)<br>WALLS _____<br>CEILING _____<br>CARPET _____<br>OTHER _____ | ☐ OK    ☐ NOT OK (see below)<br>WALLS _____ $____<br>CEILING _____ $____<br>CARPET _____ $____<br>OTHER _____ $____ |
| BATHROOMS | ☐ OK    ☐ NOT OK (see below)<br>WALLS _____<br>CEILING _____<br>FLOOR _____<br>MIRROR _____ | ☐ OK    ☐ NOT OK (see below)<br>WALLS _____ $____<br>CEILING _____ $____<br>FLOOR _____ $____<br>MIRROR _____ $____ |
| OTHERS & COMMENTS | _____ RENTAL KEYS DELIVERED TO RESIDENT<br>_____ MAIL BOX KEYS DELIVERED TO RESIDENT<br>_____ GATE ACCESS DELIVERED TO RESIDENT | _____ RENTAL KEYS RETURNED<br>_____ MAIL BOX KEYS RETURNED<br>_____ GATE ACCESS RETURNED<br>TOTAL: _____ |
| | Resident acknowledges receipt of foregoing Move-in inspection results prior to occupancy, and accepts or disputes the Move-in inspection report as noted.<br><br>RESIDENT _____ DATE 1/28/16<br>MANAGEMENT _____ DATE _____ | Resident acknowledges receipt of foregoing Move-Out inspection results and accepts or disputes the Move-Out inspection report and estimated costs as noted.<br><br>RESIDENT _____ DATE _____<br>MANAGEMENT _____ DATE _____ |

Copyright © 2/2013 by Atlanta Apartment Association, Inc. – Form #9421
All Rights Reserved

12232016 0486724

**GAA**
GEORGIA APARTMENT ASSOCIATION

**LEAD-BASED PAINT/HAZARD DISCLOSURE FORM**
For Use on Properties Contructed Prior to 1978
With Attached EPA Publication *Protect Your Family From Lead In Your Home*
Management's, Lessor's, or Owner's Copy

FORM VALID FOR
GEORGIA APARTMENT
ASSOCIATION
MEMBERS ONLY

Applicant(s) or Resident(s) Name(s)  **Yadiry Pena-Jiminez**

Unit # and/or Address ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

It is the intention of the undersigned to this disclosure notice that it become a part of their Apartment Rental Contract at such time as each of the following has occurred:
1. Approval and acceptance of the rental application;
2. Fulfillment of all conditions precedent to signing a rental contract;
3. Signature by all necessary parties; and
4. Delivery and acceptance of possession of the rental unit by applicant/lessee.

### DISCLOSURE OF INFORMATION ON LEAD-BASED PAINT AND/OR LEAD-BASED PAINT HAZARD

**1.    Lead Warning Statement**
*Housing built before 1978 may contain lead-based paint. Lead from paint, paint chips, and dust can pose health hazards if not managed properly. Lead exposure is especially harmful to young children and pregnant women. Before renting pre-1978 housing, lessors must disclose the presence of known lead-based paint and/or lead-based paint hazards in the dwelling. Lessees must also receive a federally approved pamphlet on lead poisoning prevention.*

**2.    Management/Lessor's Disclosure**
(a)    Presence of lead-based paint and/or lead-based paint hazards. (Check (i) or (ii) below)
   (i)    _____ Known lead-based paint and/or lead-based paint hazards are present in the housing [Explain What Information Is Known About the Presence or Absence of Lead on the Following Line.]

   _____

   (ii)    **x**    Management/Lessor has no knowledge of lead-based paint and/or lead-based paint hazards in the housing.

(b)    Records and reports available to the management/lessor. (Check (i) or (ii) below)
   (i)    _____ Management/Lessor has provided the applicant/lessee with all available records and reports pertaining to lead-based paint and/or lead-based paint hazards in the housing [List Any Documents or Testing that Relates to the Presence or Absence of Lead on the Following Line.]

   _____

   (ii)    **x**    Management/Lessor has no report or records pertaining to lead-based paint and/or lead-based paint hazards in the housing.

**Definitions**
As used in this form, the words "Resident" or "Lessee" shall mean the tenant who is signing the lease. The word "Management" shall mean the managing agent who is acting on behalf of the lessor, landlord, or owner of the apartment community. The word "Lessor" shall mean the owner or landlord of the apartment community.

**Certification of Accuracy**
The following parties have reviewed the information above and certify, to the best of their knowledge, that the information they have provided is true and accurate. Each person signing below must place the date by their signature.

**Applicant/Lessee's Acknowledgment:**
By signing this document (digitally or physically), Applicant/Lessee acknowledges that they have read and understood the information contained above and they have received a copy of the pamphlet "Protect Your Family from Lead in Your Home."

**Management/Agent's Acknowledgment:**
By signing this document, Management/Agent acknowledges that they have informed the lessee of the lessor's obligations under 42 U.S.C. §4852d and is aware of his/her responsibility to ensure compliance.

**Eighteen Capital Group**

By: _____    _12/25/16_
Management/Agent/Owner [Signature]    Date

_____    _10/03/16_
Management Co/Lessor [Print Management Company, Owner, or Owner's Agent's Name on this Line]

_____    _____    _____    _____
Applicant/Lessee [Signature]    Date    Applicant/Lessee [Signature]    Date

_____    _____    _____    _____
Applicant/Lessee [Signature]    Date    Applicant/Lessee [Signature]    Date

Copyright © 2013 by Atlanta Apartment Association, Inc. – Form # 9580
All Rights Reserved

122320160486701    Page 1 of 12

**MANAGEMENT'S, LESSOR'S, OR OWNER'S COPY**
Place in Resident File as a Permanent Record and Part of the Apartment Rental Contract



**LEAD-BASED PAINT/HAZARD DISCLOSURE FORM**
For Use on Properties Contructed Prior to 1978
With Attached EPA Publication *Protect Your Family From Lead In Your Home*
Applicant's or Resident's Copy

FORM VALID FOR
GEORGIA APARTMENT
ASSOCIATION
MEMBERS ONLY

Applicant(s) or Resident(s) Name(s)  Yadiry Pena-Jiminez

Unit # and/or Address  ███████████████████████████

It is the intention of the undersigned to this disclosure notice that it become a part of their Apartment Rental Contract at such time as each of the following has occurred:
1. Approval and acceptance of the rental application;
2. Fulfillment of all conditions precedent to signing a rental contract;
3. Signature by all necessary parties; and
4. Delivery and acceptance of possession of the rental unit by applicant/lessee.

**DISCLOSURE OF INFORMATION ON LEAD-BASED PAINT AND/OR LEAD-BASED PAINT HAZARD**

1. **Lead Warning Statement**
*Housing built before 1978 may contain lead-based paint. Lead from paint, paint chips, and dust can pose health hazards if not managed properly. Lead exposure is especially harmful to young children and pregnant women. Before renting pre-1978 housing, lessors must disclose the presence of known lead-based paint and/or lead-based paint hazards in the dwelling. Lessees must also receive a federally approved pamphlet on lead poisoning prevention.*

2. **Management/Lessor's Disclosure**
(a)    Presence of lead-based paint and/or lead-based paint hazards.  (Check (i) or (ii) below)
       (i)        Known lead-based paint and/or lead-based paint hazards are present in the housing [Explain What Information Is Known About the Presence or Absence of Lead on the Following Line.]

       (ii) _x_  Management/Lessor has no knowledge of lead-based paint and/or lead-based paint hazards in the housing.

(b)    Records and reports available to the management/lessor.  (Check (i) or (ii) below)
       (i)        Management/Lessor has provided the applicant/lessee with all available records and reports pertaining to lead-based paint and/or lead-based paint hazards in the housing [List Any Documents or Testing that Relates to the Presence or Absence of Lead on the Following Line.]

       (ii) _x_  Management/Lessor has no report or records pertaining to lead-based paint and/or lead-based paint hazards in the housing.

**Definitions**
As used in this form, the words "Resident" or "Lessee" shall mean the tenant who is signing the lease. The word "Management" shall mean the managing agent who is acting on behalf of the lessor, landlord, or owner of the apartment community. The word "Lessor" shall mean the owner or landlord of the apartment community.

**Certification of Accuracy**
The following parties have reviewed the information above and certify, to the best of their knowledge, that the information they have provided is true and accurate. Each person signing below must place the date by their signature.

**Applicant/Lessee's Acknowledgment:**
By signing this document (digitally or physically), Applicant/Lessee acknowledges that they have read and understood the information contained above and they have received a copy of the pamphlet "Protect Your Family from Lead In Your Home."

**Management/Agent's Acknowledgment:**
By signing this document, Management/Agent acknowledges that they have informed the lessee of the lessor's obligations under 42 U.S.C. §4852d and is aware of his/her responsibility to ensure compliance.

**Eighteen Capital Group**

Management Co./Lessor [Print Management Company, Owner, or Owner's Agent's Name on this Line]

By: _____   12/22/16
Management/Agent/Owner [Signature]        Date

Applicant/Lessee [Signature]        Date  12/23/16

Applicant/Lessee [Signature]        Date

Applicant/Lessee [Signature]        Date

Applicant/Lessee [Signature]        Date

Copyright © 2018 by Atlanta Apartment Association, Inc. - Form # 9560
All Rights Reserved

122320160486702

Page 2 of 12

**APPLICANT'S OR RESIDENT'S COPY**

## Concord Chase Apartments

### Statement of Rental Policy

It is our policy to offer equal housing for all people regardless of race, color, religion, sex, national origin, handicap status, familial status, or any other state or locally protected classifications.

Applicants for apartment homes will be accepted on a first come, first serve basis and are subject to the availability of the particular apartment type requested. "Available" apartments include those for which we have notice that an existing resident intends to vacate on or about a certain date. Circumstances not necessarily under management's control may delay the date of availability of an apartment which management may believe would be ready for a new resident. Whether a particular apartment is available can vary significantly within several hours or days.

To be considered for approval, all adults must fully complete a rental application. Any omissions, errors or falsifications may result in denial of an application or terminate the right to occupy the apartment. All applicants must be 18 years of age or older. People with a joint credit record may complete one application or apply for credit separately.

All applications are subject to approval through an outside Application Processing Agency. Approval/Denial is based on a review of the following criteria:

**Income:** Household income must be satisfactory to the community's scoring criteria of 3 times the monthly rent.

**Employment:** Applicant must be employed or provide proof of income. Each applicant must provide written proof of income such as check stubs (TWO (2) MOST RECENT REQUIRED), offer letter, most recent year's tax record or three most recent bank account statements within 72 hours of completing an application. Attending school will be accepted as an alternative to being employed but applicant must still meet criteria with regards to income and credit.

**Resident History:** Any applicant showing current rental debt or eviction will be automatically declined.

**Credit:** A complete credit history from a credit bureau is required. An acceptable accounts payable history, debt to income history, and FICO score satisfactory to the community is required.

**Check Writing History:** Check writing history will be reviewed for each applicant. An applicant who has a negative check writing history, if otherwise approved, may be required to make payments in the form of Money Order or Cashier's Check.

**Pets:** Pets are limited by size and breed. At full growth, pets may not exceed 35 pounds. There is a limit of two pets per apartment. A pet fee of $200 is required for all pets in the apartment.

**Occupancy:** Listed below is the maximum number of occupants and vehicles per apartment:

| | | | |
|---|---|---|---|
| One Bedroom | 2 occupants*/2 vehicles | Two Bedroom/One Bath | 4 occupants*/2 vehicles |
| Two Bedroom/Two Bath | 4 occupants*/2 vehicles | Three Bedroom | 6 occupants*/3 vehicles |

* People over the age of 2 years old will be included in the occupancy number for the apartment.

**Vehicles:** To allow maximum use of our parking areas, vehicles are limited to a maximum of TWO (2) cars per apartment or ONE (1) car per bedroom which ever is greater. All vehicles must be registered with management. Boats, jet skis, recreational vehicles, trucks with company logos will not be permitted on the community without management's prior approval.

**Criminal:** No felony convictions and/or convictions regarding sex related crimes.

Please ask our representative any questions you have regarding the Statement of Rental Policy.

_____     1/5/16          _____
Applicant Signature           Date                    Leasing Consultant

_____     _____
Applicant Signature           Date

3X2 bath



18 Capital Group Management

# GAA
**GEORGIA APARTMENT ASSOCIATION**

**FORM VALID FOR GEORGIA APARTMENT ASSOCIATION MEMBERS ONLY**

## APPLICATION FOR OCCUPANCY

FOR MANAGEMENT USE ONLY:
DATE FORM PRINTED _____
APARTMENT NO. _____
APPLICANT: _____
MOVE-IN DATE REQUESTED: _____
APPLICATION SUBMITTED ON: _____

Property Fax #: _____     Property Phone #: __(770) 438-0990__

### LEASING INFORMATION (TO BE COMPLETED BY MANAGEMENT)

NAME OF APT. COMMUNITY __SBV Atlanta-Concord Chase, LLC__  APT. NO. or ADDRESS REQUESTED ____
COMMUNITY ADDRESS __Spring Brook Trail, Smyrna, GA 30082__
LEASE TERM DESIRED: FROM _____ TO _____  DATE OF VISIT TO APTS. _____ MOVE-IN DATE REQUESTED ____
APT. TYPE DESIRED ____ BDRMS. ____ BATHS  FLOOR PLAN ____  RENTAL RATE $ ____ /MO.  CONSULTANT ____
HOW DID APPLICANT LEARN ABOUT US? _____  WHICH APT(S). DID APPLICANT VISIT? ____
$_____ APPLICATION FEE (for Credit Check) _____  $_____ NON-REFUNDABLE FEE (Describe) ____
$_____ GOOD FAITH DEPOSIT (Applied to Security Deposit)  $_____ OTHER SECURITY DEPOSIT (Describe) ____
$_____ PET SECURITY DEPOSIT _____  $_____ OTHER NON-REFUNDABLE FEE (Describe) ____

Note: Each Person Who Is An Applicant, Guarantor or Co-Signor Must Fully Complete a SEPARATE Application and Meet ALL Rental Qualification Requirements for Employment (Or Source of Income for Paying Rent), Rental History, Credit, and Criminal Background. A Valid Government Issued Photo ID is Required with this Application and at the Time of Move-In. Submitting this application gives Management permission to check Applicant's credit, rental, employment, and criminal history. This form may be used for approving occupancy of any single family home, mobile home, or other living space, and the word "apartment" includes any kind of landlord and tenant or occupancy agreement.

## IN ORDER TO BE APPROVED FOR OCCUPANCY, ALL QUESTIONS MUST BE FULLY AND COMPLETELY ANSWERED.

### 1. PERSONAL INFORMATION

Applicant's Name __Peru Jimenez Yndiry__  (Last Name) __Peru Jimenez__  (First) __Yndiry__  (Middle) __K__  Birthdate ____ Mo ____ Day __85__ Year
Social Security OR Individual Tax ID No. ____9120  Driver's License No. ____8576  State __Ga__  Expiration Date __4/4/2018__
Telephone #: _____  Cell Phone #: ____7132
Email: __YPJIMENEZ____
Name of Any Co-Applicant, Co-Signor, or Guarantor _____  What is the Legal Relationship to Co-Applicant, Co-Signor, or Guarantor to Applicant? ☐ Spouse  ☐ Parent  ☐ Roommate  ☐ Employer  ☐ Other (Describe): ____
Are You Currently in the U.S. Armed Forces or Reserves? ☐ Yes  ☑ No  If "Yes," State Your Rank, Service & Duty Station: ____
Have You Ever Gone By Any Other Name? ☑ Yes  ☐ No  If "Yes," What Names? __Yndiry Nuckoles__
City/State/Country in Which You Were Born __Dominican Republic__
Father's Name/DOB _____  Mother's Maiden Name/DOB _____
What is the Reason for Moving from your current residence? __Lease due__
I learned of this community from __Frier__

### 2. OTHER OCCUPANTS AND PETS OR SERVICE ANIMALS IN HOUSEHOLD

Persons and Pets who are not listed below are NOT authorized to live in the apartment. Unauthorized occupants and pets will be a lease violation.

| State All Other Occupants' Names | Ages | Relationship | Social Security or Individual Tax ID No. |
|---|---|---|---|
| 1. | | | |
| 2. | | | |
| 3. | | | |
| 4. | | | |

Do you have pets or service animals? ☐ Yes  ☐ No  [NOTE: No Deposit is required for Service Animals]  Has Pet Ever Bitten or Attacked Anyone? ☐ Yes  ☐ No
Weight Of Pet (Approx.) _____  Describe Breed, Age, Type & Size of All Pets or Service Animals ____

### 3. RENTAL HISTORY

1. APPLICANT'S CURRENT RESIDENCE:  Name of Owner and/or Apartment Community: ____
   Current Address _____  City __Loganville__  State __Ga__  Zip __30340__
   Monthly Rent Pmt. $ __800__  From: __8/2014__  To: __Present__  Phone No. ____
2. APPLICANT'S PREVIOUS RESIDENCE:  Name of Owner and/or Apartment Community ____
   Previous Address _____  City _____  State _____  Zip ____
   Monthly Rent Pmt. $ _____  From: _____  To: _____  Phone No. ____
   Reason for Leaving: _____

Copyright © March, 2014 by Atlanta Apartment Association, Inc. • Form #9411
All Rights Reserved

INITIALS __YPJ__   051720141354501   Page 1 of 4 

## 5. EMPLOYMENT HISTORY

1. APPLICANT'S CURRENT EMPLOYER: Company Name: _Childrens Youth Care. of Alanta_

   Address: _1001 Johnson Ferry Rd_                City _Alanta_   State _Ga_   Zip ████

   Phone N. ████       Supervisor's Name ████                    Monthly Income (Gross) $ _____

   Job Description _____      Employment Dates: From: _3/2010_ To: _Present_

   *PROVIDE SOURCE OF INCOME TO PAY RENT IF YOU ARE NOT CURRENTLY EMPLOYED (SEE SECTION 9): _____

2. APPLICANT'S PREVIOUS EMPLOYER: Company Name: _____

   Address: _____        City _____   State ___   Zip _____

   Phone No. _____   Supervisor's Name _____   Monthly Income (Gross) $ _____

   Job Description _____   Employment Dates: From: _____   To: _____

## 6. AUTOMOBILE

Year ____   Make (Ford, etc.) ____   Model (Taurus, etc.) ____   Color ____   License Tag No. ____   State ____   County ____

Describe Any Other Vehicle, Boat, or Trailer You Are Requesting to Use or Store at the Apartment Community: ____

## 6. CONTACT PERSONS

1. ████████████████████                    ████████   _Brother inlaw_
   Name of Family Member, Other Than Spouse                   Phone        Relationship

   Address ████████████████        ____   Zip ____

2. ████████████████   ████████   _Friend_
   Name of Person Other Than Family Member        Phone        Relationship

   Address _____   City _____   State ___   Zip _____

## 7. BANKING REFERENCE

Checking Acct. (Bank Name) _____   Acct. No. _____

Savings Acct. (Bank Name) _____   Acct. No. _____

Address of Branch _____   Phone _____

Bank Loan _____   Monthly Payment $ _____   Loan No. _____

## 8. CREDIT INFORMATION

Credit Card Acct. No. _____   Balance $ _____   Credit Card Acct. No. _____   Balance $ _____

Other Monthly Debt _____   Balance $ _____   Car Loan With _____   Balance $ _____

## 9. OTHER INCOME OR SOURCE OF SUPPORT

| | | |
|---|---|---|
| Alimony/Child Support $ ____ | Name and Address of Payor ____ |
| Public Assistance $ ____ | Name of Assistance Program ____ |
| Social Security $ ____ | Description of Benefits ____ |
| Retirement $ ____ | Name or Source of Payment ____ |
| Other $ ____ | Describe Other Sources ____ |

## 10. MANDATORY SCREENING QUESTIONS

YOU MUST ANSWER EACH OF THESE QUESTIONS. IF YOU ANSWER "YES" TO QUESTIONS 1-7, YOU MUST PROVIDE ADDITIONAL DETAILS.

1. Have You or Any Person Who Will Be Occupying the Apt. Ever Been Evicted or a Defendant in an Eviction Action?   ☐ Yes ☑ No
2. Is Any Apt. Community or Previous Landlord Trying to Collect Money from You or Any Person Who Will Be Occupying the Apt?   ☐ Yes ☑ No
3. Have You or Any Person Who Will Be Occupying the Apt. Ever Filed, Been Discharged From, or Currently Under a Bankruptcy?   ☐ Yes ☑ No
4. Have You or Any Person Who Will Be Occupying the Apt. Ever Been Convicted, Charged, Arrested, Indicted, Plead Guilty or No Contest, or Received Deferred Adjudication or Probation to (A) Any Felony? Or (B) Any Misdemeanor Involving a Sexual Offense, Stalking, Illegal Use or Possession of Weapons, Assault, Battery, Theft, Fraud, Bad Checks, Criminal Damage to Property, Trespass, Vandalism, Illegal Possession or Sale of Drugs?   ☐ Yes ☑ No
5. Have You or Any Person Who Will Be Occupying the Apt. Ever Been Asked to Move Because of an alleged lease violation of any kind?   ☐ Yes ☑ No
6. Have You Ever Lived in This Apartment Community Before?   ☐ Yes ☑ No
7. Are You Unemployed?   ☐ Yes ☑ No
8. Do you have a legal right to be in the United States?   ☐ Yes because I am a U.S. citizen   ☑ Yes because I have valid documentation from the U.S. Dept. of Citizenship and Immigration Services (USCIS); or ☐ No.  If you answered "Yes" because you are a non-U.S. citizen with proper visa documentation, please provide: Reason you are in the U.S. _____   Visa Type: _____   Visa Expiration Date _____

   I have fully and truthfully answered Questions 1-8 above.   Applicant's Initials: _____

Provide Additional Information Here to Explain the Answers to Questions 1-8 above: _____

_____

_____

Copyright © March, 2014 by Atlanta Apartment Association, Inc. - Form #0411
All Rights Reserved

051720141354502   INITIALS _YP_   Page 2 of 4

## 11. APPLICANT'S CONTRACT AND UNDERSTANDING REGARDING SUBMISSION OF THIS APPLICATION

**False or Misleading Information.** The failure to fill out all sections of this form may result in the denial of your application. Providing false or misleading information could result in denial of your rental application or termination of your rental contract. It is our policy to disapprove the application of any person who could represent a threat to the health, safety, and welfare of the other residents, occupants, visitors, and staff of the apartment community. Inappropriate or abusive conduct during the application process by the applicant or those desiring to rent an apartment will result in denial of the rental application.

**Equal Housing Opportunity Policy.** The apartment owner and Management provide equal housing opportunity for qualified applicants and do not discriminate on the basis of race, color, religion, sex, national origin, familial status, disability, or any other legally recognized status in the State of Georgia. It is the owner's and Management's policy to provide reasonable accommodations in the apartment community's operational policies and procedures and to permit the Resident to make reasonable modifications that are necessary for the Resident and related to the disability for persons with a demonstrated disability. The Resident must request and obtain permission from the owner or Management for any accommodation or modification prior to implementing the same. In general, the cost or expense of physical modifications to the apartment or apartment community is the responsibility of the Resident, unless the applicable law requires the owner or Management to absorb or be responsible for the cost of such modifications. A Resident or occupant with a demonstrated disability is allowed to have an assistance animal to assist with the person's disability. Additional Resident or occupant is allowed to have an assistance animal which has not been trained as a service animal unless the animal has a history of dangerous, vicious, or unsafe behavior. If the nature of the disability is not obvious or apparent or the manner in which the animal will provide assistance is not clear, Management has the right to request additional information regarding how the animal will assist with the resident's disability. The Resident does not have an absolute right to the specific accommodation or modification requested, and Management has the right to offer an substitute or alternate accommodation or modification with conditions that will provide adequate assurance for the safety, health, and well being of other Residents, occupants, social guests, invitees, and Management employees. No Additional Rent, Non-refundable Fee, or Animal Security Deposit is required from Residents or occupants who are disabled and have an approved service or assistance animal; however, the Resident is responsible for any and all damages and cleaning fees exceeding normal wear and tear caused by such animal.

**Good Faith Deposit.** Applicant understands and agrees that the Good Faith Deposit and other Deposits or Non-Refundable fees paid will be returned if Applicant is not accepted as a resident. Applicant will have _____ hours after submitting this application to withdraw the application and receive a full refund of the Good Faith Deposit. The notice of withdrawal must be in writing. The application fees, however, are non-refundable. If Applicant does not withdraw the application within the time specified above and Applicant is approved for occupancy, the Applicant agrees to sign a rental contract and take possession of the apartment on or before the anticipated move-in date (above), the Good Faith Deposit and other deposits or non-refundable fees shall be retained by Management as liquidated damages. If the number of hours to withdraw the application is not specified above, Applicant will only have 24 hours to withdraw the application and receive a refund of the Good Faith Deposit and other deposits and non-refundable fees. Applicant acknowledges that the Good Faith Deposit is a security deposit however, upon signing a rental contract, the Good Faith Deposit will be applied toward any Security Deposit or Non-Refundable Fees specified in the Rental Contract. In the event Applicant defaults under the terms of this Application, Applicant acknowledges that Management shall keep the Good Faith Deposit and other deposits and non-refundable fees as liquidated damages which are compensation for holding the apartment off the market. Applicant agrees that the amount of rent lost in holding the apartment off the market is unknown and that this provision is intended as a good faith estimate of Management's damages in the event of Applicant's default. The Good Faith Deposit does not constitute a security deposit.

**Rental Qualification Criteria.** Applicant understands and agrees that the rental application will be reviewed using business judgment, decisional criteria, a point scoring system, or a combination of those systems. In order to qualify for housing, the applicant must have good rental, credit, and criminal background histories. Applicant must demonstrate the financial ability to afford the apartment under Management's rental qualification criteria. A co-signer or guarantor is not a substitute for unacceptable rental, credit, or criminal background histories. Poor rental history because of disapproval of co-signer's, roommate's, or guarantor's application or because of a prior history of late payments, lease violations, failure to give proper notice, or damages exceeding normal wear and tear may result in denial of the applicant's rental application. However, the lack of a rental history may not necessarily result in a denial of the application. While exceptions (after an spouse or roommate), co-signer's and guarantors may be allowed in order to meet the rental qualification, each of those persons must meet the rental qualification criteria applicable to his or her particular rental application circumstances. Applicant and guarantors may demonstrate a certain earning level or source of income, savings or assets sufficient to insure the ability of the applicant to pay the monthly rent and living expenses, taking into account any revolving, recurring, or monthly debt from credit cards and loans. Self employed applicants may need to provide income tax returns and other business financial records (such as income and expense statements, asset statements, and personal net worth statements). Self employed persons and corporate renters may be required to pay an additional application fee to obtain Dunn and Bradstreet credit reports on themselves or their companies and submit income tax returns. Unemployed or retired applicants may need to provide additional financial documentation of ability to pay rent.

**Availability of Apartment Desired or Requested.** At the time of this Application, applicant has expressed interest in particular floor plan or type of apartment and may have requested occupancy of a specific apartment which was shown and listed on the desired unit and occupancy date above. Management cannot guarantee that the particular unit desired will be available on the date requested by the applicant or those too many variables which could result in delay or unavailability of the apartment unit. Applicant agrees to take occupancy of a comparable apartment offered by Management that reasonably matches the applicant's desired floor plan and move-in date. Applicant understands that Management may not be able to provide the desired apartment, floor plan, or move-in date if applicant changes his or her planned or expected move-in date. Unavailability of the desired apartment on the desired date does not relieve applicant from his or her contractual obligations under this contract.

**Applicant's Rental Decision.** Applicant has either asked about the Apartment Rental Contract and Addenda he or she is expected to sign upon approval of the application. Applicant agrees that he or she has fully questioned Management regarding any important information about rental of an apartment at this community. Applicant is satisfied with the answers to his or her questions and is fully informed as to all information needed to make his or her decision to apply for an apartment. Applicant understands that not all apartments in the community have fire of sight to receive satellite communication and that Management cannot guarantee high speed internet access. Applicant understands that there are limitations on the number of persons who may occupy an apartment unit, usually expressed as the HUD approved standard which allows Management to limit occupancy to no more than two persons per bedroom or sleeping space. Applicant understands and agrees that he or she must pay for all utilities and services supplied to the apartment, including, but not limited to, water and waste water, sanitation, pest control, electricity, natural gas, cable, phone and other telecommunication services. Applicant is aware that any rental concessions offered may be available only for limited items and that Applicant must comply with all conditions required to receive the concession, such conditions include fully completing the expected term of the contract without holding over the lease and without using any early termination Management for the rental value of the concession. Such conditions include fully completing the expected term of the contract without holding over the lease and without using any early termination provision. Applicant has had the opportunity to ask questions about the existence of crime in the apartment community and fully understands that Management and the Owner of the apartment community do not provide security or security devices which are intended to detect, deter, or repel crimes committed. Applicant understands and agrees that there are limitations on the size, number, and type of motor vehicles or other transportation, boats, trailers, and equipment which may be used or stored on the apartment property. Only authorized motor vehicles may be used or parked on the property. In general no more than two have more than two automobiles per apartment unit; however, applicant has specifically inquired about and understands the control of parking rules and regulations he or she will be expected to sign if approved for occupancy. Applicant fully understands that any false or misleading information provided to Management during the rental application process could lead to termination or eviction from the apartment community at a later date after taking occupancy once Management learns that the information provided was false, misleading, or inaccurate. The cancellation of a particular apartment as the one desired by applicant does not constitute a representation by Management that the apartment specified will in fact be available on the desired date. Management may notify applicant after everybody or is waiting once the application has been approved. After applicant has been approved or after Management has notified applicant that an apartment is ready for occupancy, applicant must promptly sign a lease and take occupancy of the apartment in order to avoid losing the good faith deposit and non-refundable fees.

**WARNING: YOU ONLY HAVE A LIMITED TIME TO CHANGE YOUR MIND IN WRITING ABOUT APPLYING FOR AN APARTMENT. YOU CAN LOSE YOUR GOOD FAITH DEPOSIT AND OTHER NON-REFUNDABLE FEES IF YOUR APPLICATION IS APPROVED AND YOU FAIL TO SIGN A LEASE OR TAKE OCCUPANCY OF THE APARTMENT.**

APPLICANT CERTIFIES THAT HE OR SHE HAS FULLY AND TRUTHFULLY ANSWERED ALL QUESTIONS ASKED AND VERIFIED THE ACCURACY OF ALL INFORMATION PRESENTED AND AUTHORIZES VERIFICATION OF ALL INFORMATION PROVIDED.

**Authorization for Management to Verify Rental Application and Obtain Credit Report.** The above information is complete and correct. I understand that Management will rely on the information provided in making a decision to accept, conditionally accept, or deny my rental application. Applicant authorizes Management and its agents to verify the information provided by obtaining my credit file, rental history, employment information, and criminal records and contacting my current and former employers and landlords. Applicant authorizes Management and any third parties who provide information to verify this application from all liability, claims, and lawsuits with regard to the information obtained, regardless of the source. Applicant agrees to indemnify and hold harmless Management, its agents, current or prior landlord, current or prior employer, and all other persons whatsoever who provide information, regardless of whether the information provided is negative.

**Authorization to Obtain Credit Report and Other Information in Connection with Collection of a Debt.** Applicant agrees that management or any collector retained by management is expressly authorized at any time to obtain a consumer report (credit report) on applicant and to obtain information on applicable location and employment in connection with the collection of any amounts or damages claimed due from applicant as a resident under any rental contract with management. Any employers, banks, landlords, businesses, consumer reporting agencies, or other third parties are entitled to rely on the undersignature authorization and cooperate in providing the requested information to assist in collection of any debt owed by applicant as a resident under any rental contract. Applicant authorizes any notices or demands for payment to be mailed to applicant in care of contact persons named in Section 6 above.

**Know Your Neighbors.** Certain individuals convicted of certain sex-related crimes are required to register their name and current address on an index maintained by the state or county in which they reside. You may access that index in order to determine whether any such individuals live in proximity to a certain location. The public may access the Internet to view all sex offenders registered in Georgia. The Statewide Sex Offender Registry can be obtained through the Internet at http://gbi.georgia.gov/georgia-sex-offender-registry. The public may also contact the local Sheriff to view a list of the sex offenders listed in their county.

Application Completed by Applicant on:

Date: _____ 5/16

Date and Time Application Received by Management

Applicant's Signature: _____

Print Applicant's Full Name: _____

Copyright © March, 2014 by Atlanta Apartment Association, Inc. – Form #9411
All Rights Reserved

051720141354503

EXHIBIT "F"

**RE: Yadiry K. Benavides**

NV.   nvolheim@sulaimanlaw.com
      Wed, 16 Jan 2019 4:59:38 PM -0500

      "duffoolaw" <john@duffoolaw.com>

      🗘
      ⊘ TLS <u>Learn more</u>

For Settlement Purposes Only
Mr. Duffoo,

Good afternoon.  Thanks for reaching out.  I presume Mr. Borland provided you with the case that we provided him.  If not please let me know and we are happy to provide it.  We are willing to grant you until January 23, 2019 in order to investigate and respond.  Our Client has authorized a settlement demand of $4,950 in exchange for a general release of Mr. Borland, Ms. Mckamey, and the Law Office of Brett M. Borland, P.C.  Let me know if you wish to discuss.

**Nathan C. Volheim, Esq.**
Director of Team Eagle
Atlas Consumer Law - Division of Sulaiman Law Ltd.
2500 S. Highland Avenue, Suite 200
Lombard, Illinois 60148
Phone (630) 568-3056
Fax (630) 575 - 8188
**Website:** <u>http://www.atlasconsumerlaw.com/</u>
Email: <u>nvolheim@sulaimanlaw.com</u>

*Licensed to practice in the State of Illinois and all the United States District Courts in Colorado, Illinois, Indiana, Michigan, Texas, and Wisconsin.*





**CONFIDENTIALITY:** The information contained in this e-mail message and accompanying documents are covered by the Electronic Communications Privacy Act, 18 U.S.C. <u>2510-2521</u> and contains confidential information intended only for use by the specified individual(s) and/or entity(s) named above. If you are not the intended recipient, or the employee *or agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this e-*mail in error and any review, dissemination, copying or the taking of any action based on the contents of this communication and/or attached documents is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone or email and delete the original message without making a copy. This

message, together with any attachments, is intended for the use of the individual or entity to which it is addressed and contains information that is **LEGALLY PROTECTED BY THE ATTORNEY-CLIENT PRIVILEGE, CONFIDENTIAL AND EXEMPT FROM DISCLOSURE.**

**NOT LEGAL ADVICE:** If you are not an existing client of Sulaiman Law Group, Ltd., do not construe anything in this e-mail to make you a client of Sulaiman Law Group, Ltd.  Any information in this communication is for discussion purposes only, and is not offered as legal advice. There is no right to rely on the information contained in this communication and **no attorney-client relationship is formed.**
**CIRCULAR 230 DISCLAIMER:** To ensure compliance with requirements imposed by the IRS, we inform you that any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding tax-related penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or tax related matter(s) addressed therein. Effective June 21, 2005, newly issued Internal Revenue Service regulations require that certain types of written advice include a disclaimer. To the extent the preceding message contains written advice relating to a Federal tax issue, the written advice is not intended or written to be used, and it cannot be used by the recipient or any other taxpayer, for the purposes of avoiding Federal tax penalties, and was not written to support the promotion or marketing of the transaction or matters discussed herein.

**From:** duffoolaw <john@duffoolaw.com>
**Sent:** Wednesday, January 16, 2019 2:08 PM
**To:** Nathan Volheim <nvolheim@sulaimanlaw.com>
**Subject:** Yadiry K. Benavides

Nathan C. Volheim,

I'm John Duffoo.  Brett Borland has asked me to review this matter and attempt to resolve the alleged dispute.  I have not had an opportunity to resolve this matter, but I plan to within the next couple of days.  I would appreciate your professional courtesy in allowing me time to review this matter and time to attempt to resolve this matter amicably.

Best Regards,

John M. Duffoo
Business Law Firm of John M. Duffoo, P.C.
P.O. Box 767355
Roswell, GA 30076
Tele: 770-312-6160
Email: John@duffoolaw.com
Website: www.Duffoolaw.com

**EXHIBIT G**

# RE: Yadiry K. Benavides

john@duffoolaw.com

Tue, 22 Jan 2019 11:24:17 PM -0500

"Nathan Volheim" <nvolheim@sulaimanlaw.com>

Nathan,

I appreciate the professional courtesy. In your letter dated September 26, 2018, you allege that my client violated the FDCPA for 2 reasons related to a certain correspondence mailed to your client:  (I have not seen the alleged letter and would greatly appreciate you emailing me a copy).

1.    That the correspondence purports to be reviewed and signed by 2 attorneys in the signature line, yet bears only one signature.  You state that this is false and misleading.

As I am sure you are aware, a false and misleading statement is required to be "material".  I do not believe that the alleged fact that 2 attorneys are on the signature line, but only bears one signature is material.  Further, in the 11th Circuit, to be a material misrepresentation, a statement must influence a consumer's decision or ability to pay or challenge a debt.  Thus, a statement that does not influence an unsophisticated consumer's ability to challenge a debt does not violate the FDCPA, even if the statement is false in some technical sense.  <u>Bryant v. Kass Shuler,</u> <u>P.A.</u>, 2017 WL 766343, at *2 (S.D. Fla. Feb. 28, 2017)

I read the case that you provided Mr. Borland.  First, the case is from a non-binding jurisdiction.  Second, the case is merely an order on a motion to dismiss and the pleading requirement on a motion to dismiss is low.  This order that you rely on does not support your allegation that all attorneys in the signature line have to sign and I don't believe that your theory would be adopted in this jurisdiction.  Further in the 11th Circuit, the use of an attorney's signature on a collection letter <u>merely</u> implies that the letter is from the attorney who signed it.  This implication renders your alleged theory, that both attorneys had to sign, into further doubt.

2.    That the correspondence seeks collection of an obligation not owed by your client.

It appears from the emails between you and Mr. Borland that he provided you with documents demonstrating that someone named Yadiry Pena Jiminez executed an Apartment Rental Contract and other related documents.  Is it your client's position that those documents do not relate to her, meaning that she is not the Yadiry Pena Jiminez identified in those documents?  I request that you please better explain your second alleged FDCPA violation.

Lastly, I want to address your settlement offer of $4,950.00.  I believe that your settlement offer asks for damages that the allegations do not support.  Statutory damages are capped at $1,000.00 (from $0.00 to $1,000) and I don't believe, even if a violation is demonstrated, that your client has suffered actual damages or would be entitled to the maximum statutory damages.  The balance of your settlement offer must be

attorney's fees. I also bring FDCPA claims from time to time, so I'm aware of approx how much time you have invested in this matter and I don't see that it justifies a settlement offer of $4,950.00.

My client denies any liability. Nevertheless, there is some value in settlement. Therefore, my client has authorized me to settle this matter for $500. Again I appreciate you giving me an opportunity to review and respond. I look forward to bringing this matter to an amicable resolution.

Best Regards,

John M. Duffoo
Business Law Firm of John M. Duffoo, P.C.
P.O. Box 767355
Roswell, GA 30076
Tele: 770-312-6160
Email: John@duffoolaw.com
Website: www.Duffoolaw.com

---- On Thu, 17 Jan 2019 16:11:23 -0500 **duffoolaw <john@duffoolaw.com>** wrote ----

# EXHIBIT H

**RE: Yadiry K. Benavides**

NV    nvolhelm@sulaimanlaw.com
Wed, 23 Jan 2019 7:49:28 AM -0500
"duffoolaw" <sjohn@duffoolaw.com>

TLS Learn more

FRE 408

Mr. Duffoo,

Good morning. Thank you for your email.

As a preliminary matter, see below at your request a copy of the letter. We find it difficult to understand how Defendant could properly evaluate its liability without even reviewing the letter at issue. In any event, you have it now.

Because our respective time is no doubt valuable I will keep my comments brief in response:

1. Any materiality analysis is limited to claims under section (e) of the FDCPA. Make no mistake, we find Defendant's conduct to be extremely material. As you know, the test for materiality distills down to whether the false or misleading representation would impact a consumer's decision to pay. There is no doubt that receiving a correspondence, purportedly sent by two attorneys, would materially cause a consumer to feel greater pressure to pay the obligation. We are confident discovery will bear this out. Additionally, there is no materiality requirement under section (f) of the FDCPA. We will also be alleging Defendant's conduct is unfair in violation of the FDCPA. The case we cited to may be non-binding and only at the Motion to Dismiss stage. However, it highlights the cause of action nicely. Moreover, it strongly suggests that we will be advancing at least to the summary judgement stage in litigation. I do not need to outline the costs for your Client in order to participate in litigation to that point. I also have a strong suspicion your client does not carry insurance for these claims. I suppose that is something we will disclosure through FRCP 26(a)(1) disclosures.

2. We will outline the cause of action more completely in our Client's Complaint. It basically boils down to the fact that your client was seeking collection of a debt not due and owing.

3. The $500 offer is respectfully rejected. Since you bring FDCPA claims from time to time there is no need to combat the issues of attorneys fee, statutory damages, etc. with you at this time. We both know how this practice works. In any event, $500 is a far cry from the available statutory damages plus attorney fees incurred at this point. There have been many correspondences sent on this file – including ones ignored by your client. The matter was not resolved expediently. As such, any desire to take a minimal settlement has elapsed.

We are filing several cases in Georgia through our local counsel Matt Berry of Berry & Associates. We intend to have this matter be one of them. As a firm and final offer to resolve the matter we have authority to tender a modified demand of $3,900. I can assure you it will not be reduced. The offer is extended until close of business on January 25, 2019 at which point it is withdrawn and we will take the matter up in litigation.

Nate

---



LAW OFFICE OF
# BRETT M. BORLAND, P.C.

P.O. Box 312057
Atlanta, Georgia 31131

09/06/2018

PERSONAL & CONFIDENTIAL

Yadiry Pena Jiminez
1332 MARCELLE HEIGHTS PL
Norcross GA 30093

# EXHIBIT I

# RE: Yadiry K. Benavides

john@duffoolaw.com
Fri, 25 Jan 2019 1:02:18 PM -0500
"Nathan Volheim" <nvolheim@sulaimanlaw.com>

Nathan,

You setting these arbitrary deadlines is counter-productive to us resolving this matter outside of litigation. Your initial letter was sent back at the end of Sept. and your follow-up emails were not sent until Jan. 10th. You are not under any Statute of Limitations deadline, so I don't see the need for your deadlines. I have only been involved in this matter for 1 week and at least we are making more progress than what was made since Sept. I request that you reconsider your deadlines and continue to engage in pre-suit negotiations.

I do not see how you expect me to analyse your client's demand and alleged claim based on my client allegedly "seeking collection of a debt not due and owing", if your not willing to explain. I'm not looking for you to provide me with a Summary Judgment argument, but merely better explain why you allege the debt was not "due and owing". Is it your client's position that the documents provided to you do not relate to her, meaning that she is not the Yadiry Pena Jiminez identified in those documents? or is it your client's position that they do relate to her, but the damages are not due and owing? I request again a clearer explanation.

My definition of compromise is that both parties give and take equally. As you know, the allowed amounts recoverable in FDCPA cases are: (1) statutory damages; (2) actual damages; (3) Attorney's Fees; and (4) Costs.

1.  Statutory damages are a maximum of $1,000.00:  Compromise would be $500.00
2.  Actual damages are unknown and highly unlikely given the allegations.
3.  Attorney's Fees:  I have no knowledge of your billing practices and rates.  I can only presume based on my experience of (.5) for review of the (.5) facts and (.6) hours to draft your initial 1 page letter, 2 emails 1 para each at .2 each (total .4) and your emails communications to me (.5). That is a total of 2.0 hours. If your rate is $300 an hour, this would be $600.00 in reasonable attorney's fees.
4.  Court Costs:  No costs incurred to date

Total:  $1,100.00

Notwithstanding the above, my client has authorized me to offer you $1,500.00 to settle this matter.  I think my client's offer is a true compromise and consistent and related to the appropriate damages.

Your recent offer of $3,900 does not appear to be based on a compromise or actual damages/attorneys fees.  Quite frankly, it appears to be a made up number, likely based on your prior experience on what other parties are willing to pay you and has no relation to the actual damages.  I don't believe that is appropriate.

I believe that I have justified the basis for my client's offer of $1,500.

Again, I respectfully request that you continue to engage in an amicable resolution, but if not, I would appreciate the professional courtesy in letting me know otherwise.

Best Regards,

**John M. Duffoo**
Business Law Firm of John M. Duffoo, P.C.
P.O. Box 767355
Roswell, GA 30076
Tele: 770-312-6160
Email: John@duffoolaw.com
Website: www.Duffoolaw.com

---- On Wed, 23 Jan 2019 07:47:28 -0500 **Nathan Volheim <nvolheim@sulaimanlaw.com>** wrote ----

**EXHIBIT J**

**RE: Yadiry K. Benavides**

NV   nvolheim@sulaimanlaw.com
Fri, 25 Jan 2019 1:29:22 PM -0500

"duffoolaw" <john@duffoolaw.com>

ᐧ
ⓘ TLS Learn more

For Settlement Purposes Only.

John,

Thanks for the email. The "arbitrary deadline" was not set by me, it was set by m Client.  And not that it matters but my  Court-approved (on numerous matters) billing rate is $375.  With respect, your back-off the napkin math on what has gone into this case is also significantly understated.

Since your client is clearly concerned about our billing rate and work-product I have kept my emails to you brief.  As very clearly highlighted in your last email, you do Plaintiff's work too.  As such I will give you the benefit of the doubt that you know where these things resolve themselves at.  The $3,900 demand is a far cry compared to what your clients will pay to defend this action.

We have very clearly articulated the causes of action and provided you supporting case law. As you have seen, we are more than comfortable articulating our position.  If your Client disagrees on the law it will have the opportunity to address that with the only person who matters, the Federal Judge assigned to the case.

As a gesture of good-faith we will make a final reduction to $3,250.  However, we have been instructed to keep the same deadline.

Nathan C. Volheim, Esq.
Director of Team Eagle
Atlas Consumer Law - Division of Sulaiman Law Ltd.
2500 S. Highland Avenue, Suite 200
Lombard, Illinois 60148
Phone (630) 568-3056
Fax (630) 575 - 8188
Website: http://www.atlasconsumerlaw.com/
Email: nvolheim@sulaimanlaw.com

**Licensed to practice in the State of Illinois and all the United States District Courts in Colorado, Illinois, Indiana, Michigan, Texas, and Wisconsin.*



ATLAS
CONSUMER LAW
LITIGATION · INNOVATION · CONVICTION · EXCELLENCE

Sulaiman Law Group, Ltd
FIGHTING CONSUMER HARASSMENT

CONFIDENTIALITY: The information contained in this e-mail message and accompanying documents are covered by the Electronic Communications Privacy Act, 18 U.S.C. 2510-2521 and contains confidential information intended only for use by the specified individual(s) and/or entity(s) named above. If you are not the intended recipient, or the employee or agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this e-mail in error and any review, dissemination, copying or the taking of any action based on the contents of this communication and/or attached documents is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone or email and delete the original message without making a copy. This message, together with any attachments, is intended for the use of the individual or entity to which it is addressed and contains information that is LEGALLY PROTECTED BY THE ATTORNEY-CLIENT PRIVILEGE, CONFIDENTIAL AND EXEMPT FROM DISCLOSURE.